**Homer Gene HERNDON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 51593.**

Court of Criminal Appeals of Texas.

Oct. 6, 1976.

Jerry W. Biesel, Dallas, for appellant.

Henry M. Wade, Dist. Atty., Edgar A. Mason and Jim Burnham, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for the offense of bookmaking under Article 652a, former penal code. The court assessed punishment at three years, probated, and a fine of $1,000.00.

Appellant's sole ground of error challenges the sufficiency of the evidence. In considering all of the evidence in a light most favorable to the verdict as this Court should do, the evidence is sufficient to uphold the verdict.

The indictment alleged that Herndon did "unlawfully take and offer to take and accept and place for a person known only to the Grand Jurors as 'Z', bets and wagers of money on a football game, to wit: ' "Z" Miami + 2½ 220.' "

Officers of the Greater Dallas Organized Crime Task Force, armed with a search warrant, went to the apartment which was surrounded by a chained and padlocked patio. After the officers crawled through an opening of about 2½ feet and knocked on the door, Herndon admitted them. There were two telephones on the dining room table. Deborah Cross, who was in the apartment, had forty-four hundred dollars in her purse. This was the amount calculated from the exhibits as having been collected by appellant on the day in question. Fred Glenn, who was qualified as an expert on bookmaking operations, identified gambling paraphernalia which was found in the apartment. State's Exhibits Nos. 3 and 4 were identified as line sheet documents on basketball games. State's Exhibit No. 5 was identified as " . . . a note pad listing the names of teams, the odds on the teams and the amount bet, with the individual names depicting which individual bet how much on each game"; the pad consisted of nine pages. State's Exhibit No. 6 was another note pad containing initials, a team with the odds and the amount bet on the team.

Detective Don Hamon of the Irving Police Department testified that he found a "settle up" sheet, identified as State's Exhibit No. 7, in the back bedroom. Detective Hamon testified that the "settle up" sheet disclosed the names of various bettors, their winnings and losses and the amount collected or paid by the bookmaker.

Detective D. H. Pfeifer of the Grand Prairie Police Department testified that State's Exhibit No. 8 was a "settle up" sheet and that he found it in Herndon's pocket. Pfeifer further testified that during the search the telephones in the apartment rang often and at 6:50 p. m. an individual identifying himself as "Sammy" called and when he (Pfeifer) answered, asked, "Gene?" to which he (Pfeifer) stated, "Yeah." The caller then said, "This is Sam; what's the line?" When Pfeifer gave him the line, Sammy then said, "I'll take two dollars and Miami plus two and a half," to which he replied, "You're on," and then inquired of his caller if two dollars meant two hundred dollars, to which the caller replied, "Sure," and hung up. Shortly after 6:50 p. m., a second caller who identified himself as "Jack W." called to place a bet on two basketball games.

Detective Roy Vaughn of the Dallas City Police Department, qualified as an expert on bookmaking operations, testified that State's Exhibits Nos. 3 and 4, previously identified as "line sheets" on basketball games, were basketball schedules transferred into line sheets for professional bookmaking. State's Exhibit No. 5, a spiral notebook, previously identified by Officer Glenn as having been found in the apartment, was discussed in detail by Detective Vaughn during his testimony. He testified that the "particular entries on this (page 1 of the exhibit) are actually going to be bet slips or what are commonly referred to as

'tickets'. It would be where a bookmaker would place the particular bet that an individual made, more for record keeping purposes, the amount of money wagered in the particular bet that he made, at what point he made it at." He testified that a "juice" meant the fee a person would pay a bookmaker on a losing wager, normally ten percent, so that the "juice" on a $200.00 bet would be $20.00. In testifying as to the purpose and content of a notebook sheet stapled to the back of page three of Exhibit No. 5 he stated: "In my opinion that's probably going to be some football bets, probably on the Super Bowl"—between Miami and Washington on January 14, 1973. The entry on that sheet, " 'Z' Miami + 2½ 220", was described as follows: "In my opinion that would be a bettor identified or coded by the name of 'Z' had placed a bet on Miami plus two and a half for two hundred and twenty dollars." In response to a question from the court, Detective Vaughn replied that State's Exhibit No. 5 had no date on it. An entry in State's Exhibit No. 6, "C M Washington—2 110," was identified as a wager of some sort.

Fred Green, an accountant for the Dallas Police Department, testified that he had received training in the United States Army Signal Corps in cryptography, the science of coding and decoding messages, and that he was a certified cryptographer. He related that he had analyzed several items contained in State's Exhibit No. 5 the appropriate page of which is set out on next page:

Penn ____ 🔲 Now ____ ✓ 641 ____

Utah St – 8½ ✗ 220 ____ Georgia – 14 ✗ 220

Iowa St – 14 T 110 ____ S. Caro. – 1 ✗ 220

Kentucy – 5 W 220 ____ Missouri – 6 ✗ 220

Wisc + 7 W 220 ____ Utah St – 9 ✗ 220

3 – Utah St – 8½ ✗ ____ Vanderbilt – 5½

Kentucy – 5 ✓ ____ 100 Georgia – 14

Wisc + 7 ✓ ____ S. Caro – 1

+130   –100 ____ 100 Penn + 1½
400   –220
530   –350 ____ Missouri – 6
         670
         580 ____ 100 Utah St – 9
Penn (BE)

82.5 Georgetown + 25   ✗ 75⁺ ____ 100

Fla. + 6   W 75⁺ ____ Vandert. – 6 ✗ 220

110 St. Benny + 9½   ✗ 110  "Ur   St Benny + 9½ ✗ 220

137.50 Iowa + 9   Item 2   ✗ 125⁺  –240   Mich – 9   W 220

Va T. + 1½   W 110 ____ Penn + 1   ✗ 220

–82.50 Ill. – 6½   ✗ 75 ____ Iowa St – 14 T 220

–110 Miss St + 5½   ✗ 110   Dick G S.Louis + 7 ✗ 220
(147.50)

SMU + 6½   W 55 ____ SMU + 6½ W 110

N. Mex – 7½   W 55 ____ Illinois – 6 ✗ 110

Tex 2. + 9½   W 75⁺   Cecil

Calif + ✓   W 165 ____ Fla. + 6½   W 55

Calif + ✓ ____ Geo T – 5½   ✗ 55

10 ✗ Geo T – 5½ ____ N. Mex – 7½   W 55

Wash – 10 ____ Baylor + 7 W 55

Item 3 ____ Miss St + 1½ ✗ 55

75
100
91.50   50
101   50
137.50   75
91.50   150
110.00   500
15.50
53.50

Item 1

Item 4

He stated that beginning midway in the left column of the page the entry "Jim (BE)[1] showed that the bettor listed as "Jim (BE)" had placed bets ". . . on the various teams beginning with Georgetown down through and including a bet on California and also a three-team parlay down here at the bottom on California, Georgia Tech and Washington." The entries to the right side of the column of teams[2] represent the amounts of money bet on the particular games, such as, Georgetown 75, Fla 75, St. Bonny 110, etc. The notations,[3] six in number, on the left side of the column represent the losses that the bettor sustained on those particular bets, for example: 82.50 Georgetown, 110 St. Bonny, 137.-50 Iowa, etc. In response to the question, "Would you tell the court why you conclude that the bettor sustained those losses as opposed to the bookmaker?", he replied:

"Well, its very simple: It's common procedure in the bookmaking business to add a ten percent amount which is commonly referred to as juice. This would, of course, be substantiated by the fact that the seventy-five dollars plus seven dollars and fifty cents or a total of eighty-two dollars and fifty cents."

Green then described the X's[4] as representing the amount of money that the bookie won and the W's[5] as representing the amount of money that the bettor won. He further stated that the bookie usually indicated the bettor's winning transactions by a plus. The two columns of figures at the bottom[6] were described as a summary of the wins and losses of the bookmaker as opposed to the bettor. In this instance the difference in the two columns was $32.50, the amount of money lost by Jim and this figure is verified by the fact that it is consistent with the rest of the computation, the regular bets plus the "juice" and that the figure had been carried forward to the third page over of notes in State's Exhibit No. 5. The page was identified as the page entitled "Monday Joe F –135" and is set out on next page:

1. Noted as "Item 1" on the page from State's Exhibit No. 5 about which Green was testifying.

2. Noted as "Item 2" on the page from State's Exhibit No. 5 set out above.

3. Noted as "Item 3" on the page from State's Exhibit No. 5 set out above.

4. Shown in Item 2 on page from State's Exhibit No. 5 set out above.

5. Ibid.

6. Shown as Item 4 on the page from State's Exhibit No. 5 set out above.

Mon

Joe F    −135        135
641      −1400       700
Ert      −240        240
Dick     −230        230
Cecil    +40                     40
Paul     −180        −180
→ Jim    −32.50      32
Hutt     +36                     18
TR Dave  +30                     15
Jo       +80                     80
Joe D    110         55
Ken      220         220
Jimmy    10          10
✓ Hst    135         135
Jim W    147.50      148
Jerald   50                      50
Mike     55          55
Mr S     145                     7?
                     2090
                     275
                    1825

The entry about which he was testifying appears as "Jim −32.50".[7] Green then testified that by using the figures which appeared on two preceding pages and the figures on this page he was able to calculate how much the bookmaker had won or lost on Monday and in his opinion the bookmaker had a total winning of $1825.00 for Monday's bets.

7. The entry in question is indicated by the "arrow and underline."

Based on an examination of each subsequent page of State's Exhibit No. 5, Green concluded that the bookmaker had a practice of settling up "on a more or less day-to-day basis." The examination of the subsequent pages revealed that on the day of appellant's arrest the bookmaker, using State's Exhibit No. 5, had collected $4428.00, "that this would include a hundred forty-five dollars losses and some forty-six hundred dollars winnings."

State's Exhibit No. 8 identified earlier by Detective Pfeifer as a "settle up" sheet, was found in appellant's front trousers' pocket at the time of his arrest. State's Exhibit No. 8 is set out below:

Green testified that the $4428.00 which he had calculated from State's Exhibit No. 5 as the bookmaker's winnings was consistent with the total winnings computed from State's Exhibit No. 8. He stated that the figures which were "checked off" indicated

that the bettors had been contacted and a settlement had been made. He further testified that $4400.00 had been found in the purse of Deborah Lucille Cross when she and Herndon were arrested.

Green also testified that from his examination of the first page of State's Exhibit No. 5 a bettor identified as "ELT" had made four bets. He stated that "ELT" appeared as a bettor throughout the sheets contained in State's Exhibit No. 5 and that this would indicate to him that someone was wagering whose code name or initials were "ELT" or perhaps "ELT" was short for or part of a name with "ELT" in it. We have examined State's Exhibit No. 5 in detail and find that "ELT" appears on five other pages in the exhibit.

Elton Schackman who admitted that he was a hostile witness testified that he had known appellant for ten years and had been placing wagers with appellant on games he watched on television for a couple of years. He stated that his bets were usually in the amount of one hundred dollars but never more than two hundred dollars. After being hesitant and evasive in response to questions concerning the Super Bowl football game between the Miami Dolphins and Washington Redskins on January 14, 1973, Schackman refreshed his memory from a statement he had written two and one-half years prior to trial and testified that he had placed a two hundred dollar bet with appellant. He further testified that he had also placed a bet on the Cotton Bowl football game between Texas and Alabama on January 1, 1973, as well as bets on the Kansas City Chiefs. He further testified that when he won bets he had placed appellant paid him and when he lost he paid appellant. Schackman testified that he placed bets on basketball games as well as football games. In reference to his betting he stated that he would usually make wagers on three or four games a week totalling five hundred to seven hundred dollars a week.

Harry Crutcher, Jr., the foreman of the grand jury which returned the indictment in question, testified that an investigation had been conducted by a special investigator assigned to the grand jury by the Dallas Police Department and efforts to determine the identity of an individual known as "Z" had been unsuccessful and the grand jury determined that further investigation would be futile. He revealed the grand jury then returned the indictment alleging that "Z" was a person unknown to the grand jury.

Viewing the evidence in a light most favorable to the verdict, it shows that appellant and Deborah Cross were found in the apartment behind a padlocked patio. He admitted the officers. They were in possession of gambling paraphernalia. The evidence further shows that State's Exhibit No. 8, a "settle up" sheet, was found on appellant's person and $4400.00 cash was found in Cross' purse. During the execution of the search warrant, two bettors who identified themselves as "Sammy" and "Jack W." called up and placed bets with Detective Pfeifer who posed as "Gene" [appellant's name] in response to the calls. The names "Sammy" and "Jack W." appear numerous times in State's Exhibits Nos. 5, 7 and 8. This much of the evidence is undisputed.

The thrust of appellant's argument is that the evidence is insufficient to connect him with the apartment and the gambling paraphernalia found therein. He contends that there is no evidence to show his knowledge of the spiral notebook identified as State's Exhibit No. 5 containing what appears to be a record of numerous bookmaking transactions. Appellant argues that the State failed in its burden of proof in that there was no evidence presented to show that he had leased the apartment or that he was paying the utility or telephone bills on said apartment nor did the State present any fingerprints, surveillance efforts, personal effects, handwriting comparison analysis or furtive gesture which would tend to show his connection with the apartment or would indicate his knowledge of the bookmaking materials. He does not discuss that State's Exhibit No. 8, a "settle up sheet", was found on his person, evidence in itself to show that he had knowledge and was

party to some system of bookmaking. See *Davis v. State,* 156 Tex.Cr.App. 76, 239 S.W.2d 109 (1951); and *Smith v. State,* 491 S.W.2d 924 (Tex.Cr.App.1973).

There was no showing of who owned, rented, or leased the apartment where appellant was arrested, nor was there a showing to whom the telephones were listed and no showing who paid the utilities. Very few, if any, self-respecting bookmakers would have their place for bookmaking and telephone listed under their names if other names could be used. If the failure to prove who owned or leased premises where bookmaking takes place would be cause for reversal, then the large operators could in almost all cases escape conviction by leasing in someone else's name.

It is not essential to sustain this conviction to show all of the above if it is shown by other evidence that appellant had knowledge of and exercised control over the gambling paraphernalia found in the apartment. State's Exhibit No. 8, identified by Detective Pfeifer as a "settle up" sheet, commonly used by bookmakers, was found in appellant's trousers' pocket. Thus, appellant had the knowledge of and exercised control over State's Exhibit No. 8. But what about State's Exhibit No. 5, the spiral notebook containing a record of numerous bookmaking transactions? Did appellant exercise control over it or did he have knowledge of its existence, purpose and content? Does the evidence as presented connect appellant with State's Exhibit No. 5? The evidence is undisputed that Elton Schackman placed bets with appellant on numerous occasions for a couple of years. Fred Green, the cryptographer whose testimony was summarized earlier to the effect that the appearance of "ELT" throughout the sheets of State's Exhibit No. 5 "would indicate to him that someone was wagering whose code name or initials were 'ELT' or perhaps

'ELT' was short for or part of a name with 'ELT' in it." The code name "ELT" appears in State's Exhibit No. 5; it appears on six of the nine pages in the spiral notebook so identified. It also appears in two other exhibits admitted into evidence by the State. By totalling the figures relating to "ELT" we find that "ELT" had lost the total sum of $540.00.

The code name "Jack W.", one of the callers during the search of the apartment, appears six times in State's Exhibit No. 5. A similar addition check on his losses as was done of "ELT" shows that "Jack W." lost $973.00. Additionally, the code name "Sammy", the other caller at the time of appellant's arrest, appears on the front of State's Exhibit No. 5 as "Sammy 200 2½."

The question now presented is whether or not the above discussed analysis of State's Exhibit No. 5 establishes or tends to show any connection of that exhibit with appellant. Let's now examine State's Exhibit No. 8, the "settle up" sheet found on appellant's person. The first entry of significance is that which shows $540.00 as the amount owed by and collected from "ELT". Next, the entry for "Jack W." shows $937.00 as the amount owed by and collected from "Jack W." Both of these amounts are identical to the amounts shown as being owed by these two bettors in State's Exhibit No. 5, the spiral notebook containing a record of bookmaking transactions. There are numerous other instances where the code names which appear on the "settle up" sheet appear in the spiral notebook. So that the reader may make the same comparison for himself to note the similarities, especially in the handwriting, which exist between the entries on the "settle up" sheet and the sixth page of the spiral notebook, State's Exhibit No. 5, the two are set out on next page:

**118**

State's Exhibit 8
Settle Up Sheet

State's Exhibit 5
Spiral Notebook
Extract from sixth page

It does not take a trained eye to recognize that the handwriting in the two instances is identical. Specifically this Court need only look at the code names RO, HST, LUTT, Ted and Jack W to cite just a few of the writing similarities. It is reasonable to assume that the fact finder, the trial judge, made the same comparison. Such comparison is authorized by Article 38.27, V.A.C.C.P., which provides:

"It is competent to give evidence of handwriting by comparison, made by experts or by the jury. Proof by comparison only shall not be sufficient to establish the handwriting of a witness who denies his signature under oath."

See also *Salinas v. State*, 479 S.W.2d 913 (Tex.Cr.App.1972). The evidence is before this Court and, therefore, this Court can review it as did the trial court in order to determine its sufficiency in light of the entire record.

Most of the entries on the "settle up" sheet, State's Exhibit No. 8, and the sixth page of the spiral notebook, State's Exhibit No. 5, are identical. The exceptions are easily explained under the carry forward practiced as testified to by Fred Green. For example, the entry "R. —44" appears on the sixth page of State's Exhibit No. 5 while the entry appears as "Ro —44 —34 (78) on the "settle up" sheet. On the *seventh* page of State's Exhibit No. 5, an entry pertaining to "Ro" is as follows:

*[handwritten note: "20 ⌈ Syracuse –1 X rr / 10 ⌈ N. D. P w rr / –34 ⌊ Golden S. –5 X rr"]*

Thus, on the "settle up" sheet appears " –44 –34 (78)." We could continue with similarities. There are sufficient similarities between the "settle up" sheet, State's Exhibit No. 8, found on appellant's person and the entries in the spiral notebook, State's Exhibit No. 5, found on the kitchen table in the apartment. Further, to even the untrained eye, the handwriting is very similar if not identical.

Having established appellant's knowledge and probable use of State's Exhibit No. 5, the spiral notebook, containing a record of several bookmaking transactions, found on the kitchen table, we must also address ourselves to the question of whether or not the evidence supports the charge as drawn in the indictment.

■ The indictment alleged that on or about January 12, 1973, in Dallas County, he "did then and there unlawfully take and offer to take and accept for a person known only to the Grand Jurors as 'Z' bets and wagers of money on a football game, to wit: 'Z' Miami + 2½ 220." This bet is found recorded on the fourth page of State's Exhibit No. 5. The evidence establishes that the Super Bowl game between the Miami Dolphins and Washington Redskins was played on January 14, 1973, as this matter was testified to by both Schackman, a close friend of appellant who admitted he placed a bet on that game, and by the testimony of Detective Vaughn. Appellant's middle name is "Gene", that is the name he is known by to his friends. The two bettors who called while officers were executing the search warrant, after having identified themselves as "Sammy" and "Jack W.", asked for "Gene". Those con-

versations have been previously set out in discussing Detective Pfeifer's testimony. The telephone calls were evidence that tended to connect appellant with the bookmaking activities alleged in the indictment without regard as to the truth of the facts related in the calls. The fact that gambling telephone calls were made to the apartment is admissible to show the nature of the enterprise when the gambling paraphernalia was found. See Wharton's Crim.Evid., 13th Ed., Vol. 2, Section 274, page 26. In *State v. Tolisano,* 136 Conn. 210, 70 A.2d 118, we find the correct rule as follows: "If the fact in controversy is whether a communication was made and not its truth or falsity, the writing, words, or other communication is original evidence and not hearsay." 1 Branch's Ann.P.C.2d, Section 130, page 142; *Burchfield v. State,* 475 S.W.2d 275 (Tex.Cr.App.1972); *Christ v. State,* 480 S.W.2d 394 (Tex.Cr.App.1972). As stated in *Wigmore,* Volume VI, Section 1770, page 259, "Where the *utterance of specific words* is itself *a part of the details of the issue under the substantive law and pleadings,* their utterance may be proved without violation of the hearsay rule because they are not offered to evidence the truth of the matter that may be asserted therein." The calls were properly admitted.

Appellant further argues that there was no evidence presented which showed that the bet was taken in Dallas County. This argument is without merit. The evidence is sufficient to show that appellant's bookmaking operation was run from apartment 204, located at 9922 Miller Road in the City of Dallas. The fact that Schackman admitted that he made bets with appellant, that

the two called, "Sammy and Jack W.," placed bets at that location with Detective Pfeifer posing as appellant, and that State's Exhibit No. 5, the spiral notebook containing a record of bookmaking transactions with which appellant's connection had been established, was found in the apartment along with other gambling paraphernalia leaves only one logical conclusion—"Z's" bets as well as several others were made in Dallas.

Appellant also argues that the evidence did not establish that the bet in question was in fact a bet on a football game as charged in the indictment. The evidence shows that Miami and Washington played on January 14, 1973, in the Super Bowl. The sheet of paper on which the bet " 'Z' Miami + 2½ 220" was recorded is stapled to the fourth page of State's Exhibit No. 5 and appears as follows:

| Lutt | Wash - 2½ | 55 |
| Morris | Miami + 3 | 330 |
| "Z" | Miami + 2½ | 220 |
| Jud | Wash - 2½ | 330 |
| Ace | Miami E | 500 |
| Don | Wash | 0 - 240 |
| Dutch | Wash | 0 - 110 |
| Willy | Wash | 0 - 55 |
| Be | Wash - 2 | 330 |
| BP | Wash - 2 | 110 |

As can readily be observed, the entries on this page relate only to bets on "Wash" and "Miami". Four of the ten code names appearing on this sheet also appear on the "settle up" sheet, State's Exhibit No. 8, found on appellant's person. When this exhibit is viewed in context with all of the other evidence, these bets were placed on the Miami-Washington football game. To reach any other conclusion would require

the trial court to disregard its experience, logic and common sense. Detective Vaughn identified the entry as a bet by a bettor with the code name "Z" who had placed a bet on Miami plus two and a half for two hundred and twenty dollars.

■ This is a circumstantial evidence case, but it is not necessary that every fact point independently and directly to appellant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Mills v. State*, 508 S.W.2d 823 (Tex.Cr.App.1974). If the evidence in the instant case is viewed in its entirety the reader is left with the inescapable conclusion that appellant was in the business of bookmaking and operated such business from the apartment located at 9922 Miller Road in Dallas. The unusual and striking code name similarities, the similar or identical handwriting, and the sums of money reflected in State's Exhibit No. 5 and State's Exhibit No. 8, the "settle up" sheet found on appellant's person, show appellant's knowledge and culpability with respect to State's Exhibit No. 5, the spiral notebook containing records of several bookmaking transactions. The fact that Deborah Cross had $4400.00 in her purse at the time of appellant's arrest, only $28.00 short of the amount Fred Green calculated from the "settle up" sheet, State's Exhibit No. 8, as having been collected by appellant as well as the two bets placed with Detective Pfeifer posing as appellant, are more than just happenstance. A "wager" has been defined as a "contract by which two or more parties agree that a sum of money or other thing shall be paid or delivered to one of them on the happening of an uncertain event." It is not necessary to show the true (personal) identity of the second or additional parties when it is shown by all of the evidence that it is in harmony with the evidence that the party accepting the wagers is identified and his mode of operation proven. The evidence is sufficient to show that appellant was the person connected with State's Exhibit No. 5 wherein "Z's" bet was recorded and that appellant was the person with whom it was recorded.

The judgment is affirmed.

ONION, Presiding Judge (dissenting).

In his sole ground of error appellant challenges the sufficiency of the evidence to sustain the conviction. The indictment, omitting the formal parts, alleged that the appellant in Dallas County, Texas "on or about the 12th day of January in the year of our Lord One Thousand Nine Hundred and 73 in the County and State aforesaid, did then and there unlawfully take and offer to take and accept and place for a person known only to the Grand Jurors as 'Z,' bets and wagers of money on a football game to wit: 'Z' Miami + 2½ 220." [1]

It is appellant's contention that the evidence failed to establish venue, failed to establish when the alleged offense occurred and generally failed to sustain the allegations of the indictment.

Detective W. D. Glenn of the Greater Dallas Organized Crime Task Force testified that on January 12, 1973, pursuant to a search warrant he and other officers conducted a search of apartment #204 in Dallas at 9922 Miller Road. Glenn related the appellant Herndon admitted them after they knocked on the apartment door. Glenn observed that in the apartment there was a living-dining room arrangement and on top of the dining room table were two telephones. A Deborah Cross was found in the kitchen and arrested. In her purse was forty-four hundred dollars. Glenn, who was qualified as an expert on bookmaking operations, also testified he observed State's Exhibits #3 and #4, which he described as line sheet documents on basketball games. Glenn identified State's Exhibit #5 as a note pad of nine pages listing names of teams, the odds on the teams and the amount bet, with the individual names depicting which individual bet how much on each game. He, however, never stated that

---

1. It is observed the indictment upon which this trial was had was not returned until January 20, 1975.

State's Exhibit #5 was found in the apartment. He also identified State's Exhibit #6 as a note pad containing initials, a team with the odds and the amount bet on the team.

Detective Don Hamon of the Irving Police Department assisted in the search and testified he found a "settle up" sheet in the bedroom described as disclosing the names of various bettors, their winnings and losses and the amount collected or paid by the bookmaker. This sheet was admitted as State's Exhibit #7.

Detective Pfeifer of the Grand Prairie Police Department also assisted in the search and disclosed he had found a "settle up" sheet in appellant's front pants' pocket. Contrary to Glenn's description of the location of the telephones, Pfeifer testified one was on the kitchen table and another in the bedroom. He related the phones rang often, and, over objection, testified that at 6:50 p. m. an individual identifying himself as "Sammy" called and when Pfeifer answered, asked "Gene?" to which Pfeifer stated, "Yeah." Pfeifer then testified, "The caller stated, 'This is Sam; what's the line?' I gave the line to the caller. Sammy then said, 'I'll take two dollars on Miami plus two and a half.' I said, 'You're on,' and asked if two dollars meant two hundred dollars and he said, 'Sure,' and hung up."

Pfeifer related that after 6:50 p. m. a "Jack W" called to place a bet on a basketball game.

Ray Vaughn, Dallas City Police Department sergeant, was qualified as an expert on bookmaking operations. He testified that State's Exhibits #3 and #4 were basketball schedules transformed into line sheets for professional bookmaking. Vaughn testified that State's Exhibit #5, a spiral notebook, and the "particular entries on this (page 1 of exhibit) are actually going to be bet slips or what you would commonly refer to as tickets. It would be where a bookmaker would place the particular bet that an individual made more for record keeping purposes, the amount of money wagered in the particular bet that he made, at what point he made it at." He testified that a "juice" meant the fee a person would pay a bookmaker on a losing wager, normally ten percent, so that the juice on a $200 bet would be $20. His attention was then directed "to a notebook sheet stapled to the back of that page (three of Exhibit #5)," and he stated, "In my opinion that's probably going to be some football bets, probably on the Super Bowl" between Miami and Washington on January 14, 1973. His attention was then directed to the entry on that sheet, " 'Z' Miami + 2½ 220" and he stated, "In my opinion that would be a bettor identified or coded by the name of 'Z' had placed a bet on Miami plus two and half for two hundred and twenty dollars." Under the court's questioning he admitted State's Exhibit #5 had no date on it. He was shown State's Exhibit #6 and the entry "C M Washington—2 110," and he stated it was a wager of some sort. When asked if it was the Washington football game, he answered, "Well, that's . . actually be hard to say whether it was a football game or not."

Fred Green, an accountant and cryptographer of the Dallas Police Department, testified he had examined the exhibits in evidence and had made computations therefrom. He testified it was his opinion that the first three pages of Exhibit #5 reflected the bookmaker as winning $1,825 for the "Monday"[2] reflected thereon. He testified State's Exhibit #8 revealed that $4,400 had been netted on various bets and that was the amount found in Deborah Cross' purse. Green also related that a bettor whose code name or initials were "ELT" appeared throughout the exhibits.

Elton Schackman testified he had known the appellant for 10 years and for a couple of years had placed wagers with the appellant on games he watched on television. He explained he did not know appellant was a bookmaker, but that appellant placed

2. On page 1 of State's Exhibit #5 is the handwritten "Mon," which the witness translated into "Monday."

bets for him and he received money from the appellant when he won and he paid appellant when he lost. Schackman, after his memory was refreshed, testified he placed a bet with the appellant on the Miami Dolphins in the 1973 Super Bowl on January 12, 1973.

The foreman of the grand jury, Harry Crutcher, Jr., which returned the indictment in question, stated that an indepth investigation had been conducted by a special investigator assigned to the grand jury by the Dallas Police Department and efforts to determine the identity of an individual known as "Z" had been unsuccessful and the grand jury determined that further investigation would be futile. He revealed the grand jury then returned the indictment alleging that "Z" was a person unknown to the grand jury.

Turning to the question presented on appeal, the sufficiency of the evidence, it is observed that this is a circumstantial evidence case. The question is not whether the evidence is sufficient to show that appellant was connected with bookmaking but whether the State sustained its burden of proof to specifically show that on or about January 12, 1973, in Dallas County the appellant "did then and there unlawfully take and offer to take and accept and place for a person known only to the Grand Jurors as 'Z' bets and wagers of money on a football game, to wit: 'Z' Miami + 2½ 220" as charged in the indictment.

"The legal meaning of the term 'bet' is the mutual agreement and tender of a gift of something valuable, which is to belong to one of the contending parties, according to the result of a trial of chance, or skill, or both combined." *Odle v. State*, 139 Tex. Cr.R. 288, 139 S.W.2d 595 (1940). "A wager is a contract by which two or more parties agree that a certain sum of money or other thing shall be paid or delivered to one of them on the happening of an uncertain event." *Odle v. State*, supra.

The State relies in large measure upon the notation found in State's Exhibit #5, "'Z' Miami + 2½ 220," and upon the opinion testimony that this represented a wager on a football game.

While the State offered an officer's opinion that "Z" was a code name or initial for an individual and the grand jury foreman testified as to efforts to locate "Z," this was the only proof offered to show "Z" was a living person or that "Z" ever represented a living person capable of making a wager.

The only evidence that the bet or wager was on a football game as alleged in the indictment was Officer Vaughn's opinion testimony the entries on page 3 of Exhibit 5 were "probably going to be" football bets on the Super Bowl and so identified the notation "'Z' Miami + 2½ 220" as being such a bet. However, when shown the entry "C M Washington . . . 2 110" on Exhibit 6 he could not say whether that was a wager on a football game or not.

Next, we look to see if the appellant was connected with Exhibit 5.

Although appellant was arrested in the apartment, there was no showing who owned, rented or leased the apartment, no showing to whom the telephones were listed and no showing who paid the utilities. Much of the exhibits were in handwriting, including the notation in State's Exhibit #5, as well as State's Exhibit #8, found in appellant's pocket, but no handwriting testimony was offered and there was a void of fingerprint testimony. While Officer Glenn testified he saw some betting slips on the kitchen table, he never testified that State's Exhibit #5, a spiral notebook of nine pages, was one of the items observed or that it was found in the apartment in question. If it was, he never identified the notation "'Z' Miami + 2½ 220" as being part of such exhibit when found. The code "Z" was found only in Exhibit #5 and that exhibit bore no date at all.[3]

3. Article 21.02, Sec. 6, Vernon's Ann.C.C.P., provides:
"The time mentioned must be some date anterior to the presentment of the indict-

ment, and not so remote that the prosecution of the offense is barred by limitation."
It is well settled that under this provision and its forerunners the State is not bound by the

The appellant was in the apartment at the time of his arrest, but his relationship to the apartment was not established. Even if Exhibit #5 was found in the apartment, his connection thereto by fingerprints, handwriting or possession was not established. There can be no doubt that other proof raised a strong suspicion or probability that the appellant was involved in the alleged offense, but in a circumstantial evidence case is this sufficient?

In 24 Tex.Jur.2d, Evidence, Sec. 742, p. 422, it is written:

"In criminal cases, a judgment of conviction, to be sustained on appeal, must be supported by evidence that produces a moral certainty of the guilt of the accused to the exclusion of every reasonable doubt. The evidence will be insufficient to sustain the conviction where, although not leaving the accused free from suspicion of guilt, it still fails to show his guilt to a moral certainty, so as to exclude all reasonable doubt."

In *Smith v. State*, 165 Tex.Cr.R. 445, 308 S.W.2d 516 (1958), this court wrote:

"As the state's case depends solely upon circumstantial evidence, the evidence in order to be sufficient to show appellant's guilt must exclude every other reasonable hypothesis save and except his guilt and must go further than to raise a probability or suspicion." See also *Hollingsworth v. State*, 419 S.W.2d 854 (Tex.Cr.App.1967).

And as stated in *Culmore v. State*, 447 S.W.2d 915 (Tex.Cr.App.1969):

"A conviction on circumstantial evidence cannot be sustained on proof amounting only to a strong suspicion or mere probability. Such proof does not exclude every other reasonable hypothesis except that of the guilt of the accused."

See also *Higgins v. State*, 515 S.W.2d 268 (Tex.Cr.App.1974); *Walker v. State*, 513 S.W.2d 39 (Tex.Cr.App.1974); *Randolph v. State*, 505 S.W.2d 845 (Tex.Cr.App.1974); *Prejean v. State*, 480 S.W.2d 652 (Tex.Cr. App.1972).

It is true in circumstantial evidence cases it is not necessary that every fact point independently and directly to the defendant's guilt, for it is enough if the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances, *Mills v. State*, 508 S.W.2d 823 (Tex.Cr.App.1974), but the circumstantial evidence must be sufficient to exclude every other reasonable hypothesis except that of the defendant's guilt. *Nelson v. State*, 505 S.W.2d 271 (Tex.Cr.App.1974).

I would find the evidence in the instant case insufficient to sustain the conviction. The judgment should be reversed and the cause remanded.

ROBERTS, J., joins in this opinion.

date on or about which the offense is alleged to have been committed, but a conviction may be had upon proof that the offense was committed any time prior to the return of the indictment that is within the period of limitation. *Rogers v. State*, 169 Tex.Cr.R. 239, 333 S.W.2d 383 (1960), and cases there cited; *Neal v. State*, 374 S.W.2d 668 (Tex.Cr.App.1964); *Nees v. State*, 402 S.W.2d 186 (Tex.Cr.App.1966). The period of limitation for the offense of bookmaking would be three years under Article 12.04, Vernon's Ann.C.C.P., in effect at the time of the alleged offense.

The only evidence bearing on the question of whether the offense, if any, was committed prior to the return of the indictment on January 20, 1975, and within the three year limitation period is the fact that the undated exhibit containing the notation may have been found in the apartment on January 12, 1973. As earlier noted, State's Exhibit #5 was not identified as having been found in the apartment on the date in question. There was speculation by some witnesses that the notation had referred to the Super Bowl game which occurred on January 14, 1973, but this was based only on the fact that the arrest took place on January 12, 1973, and Miami was one of the teams in that contest. There was no showing that Miami and Washington had never met in a football game before. So there is also clearly a question of "when" the alleged offense occurred.