Suzanne Schiller TURNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 61522.

Court of Criminal Appeals of Texas, Panel No. 2.

Feb. 6, 1980.

On State's Motion for
Rehearing July 21, 1982.

Roy L. Merrill, Jr., Fred M. Bruner, Dallas, for appellant.

Henry M. Wade, Dist. Atty., Steve Wilensky, and Richard G. Worthy, Asst. Dist. Attys., Dallas, and Alfred Walker, Asst. Dist. Atty. and Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for theft of $10,000 or over. Punishment was assessed by the jury at confinement for 15 years and 1 day and a $10,000 fine.

In her first ground of error appellant challenges the sufficiency of the evidence. The indictment alleges that appellant did:

"knowingly and intentionally exercise control over property, other than real property, to-wit: current money of the United States of America of the value of at least $10,000.00 without the effective consent of James P. Forrest, the owner thereof, and with intent to deprive James P. Forrest of said property. . . ."

Specifically, appellant argues that the evidence is insufficient to show that James P. Forrest was the owner of the money.

Appellant owned and operated the Dallas Weight Control Clinic, with which Dr. Robert Craig was associated. She used Dr. Craig's Medicaid number and signature stamp to submit false claims for medical services never rendered. The claims and payment checks were processed through Blue Cross-Blue Shield, which was underwriting the Medicaid program in Texas at that time. The funds appellant was prosecuted for having stolen were Blue Cross-Blue Shield Medicaid funds.

V.T.C.A., Penal Code Sec. 1.07(a)(24) and (28) provide:

" 'Owner' means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor.

" 'Possession' means actual care, custody, control, or management."

Forrest was the alleged owner of the money, and it was incumbent upon the State to prove his ownership in order to sustain its burden of proof. Blue Cross-Blue Shield, not Forrest, was title owner. The "greater right to possession" concept of ownership only applies in cases where both the accused and the complaining witness each have some possessory interest in the property. *McGee v. State*, (Tex.Cr.App.) 572 S.W.2d 723, 725. The issue in this case therefore turns on whether the evidence shows that Forrest had possession of the money, i.e., whether he had "actual care, custody, control, or management."

Forrest gave the following testimony describing his job and responsibilities:

"Q. Mr. Forrest, how are you employed, sir?

"A. I'm employed by Blue Cross-Blue Shield of Texas.

"Q. And in what capacity, sir?

"A. I am program integrity specialist.

"Q. Would you briefly explain to the Jury what the primary function of your job is, sir?

"A. My responsibilities deal with fraud and abuse.

"Internally I am responsible to see that our systems do not allow fraudulent claims to be paid. If they are detected before payment or something suspicious is detected before payment then it's brought to me for quick investigation and determination as to whether we should pay it or not.

"If fraud is detected after payment then it's my responsibility to see that it is investigated and followed through to a final conclusion.

"Q. Mr. Forrest, if you were made aware of a fraudulent claim prior to this—do you have the authority, sir, to order that payment not be made?

"A. Yes, sir, I do.

"Q. Okay, and then if the assistant— let me ask you this.

"Are you responsible for coordinating systems to prevent fraud abuse?

"A. Yes, sir, I am.

"Q. If your system failed and money is fraudulently obtained, that is obtained upon claims that should not be paid because services were not rendered as indicated on the forms, would that be without your consent, sir?

"A. Yes, sir, it would.

"Q. Okay. Now, Mr. Forrest, how long have you been employed by Blue Cross-Blue Shield?

"A. 11 and a half years.

"Q. Okay, now how long have you been in the Position that you're in as far as guardian of the funds, so to speak, for the Medicare-Medicaid Program?

"A. Six or seven years."

It is clear that Forrest's responsibilities are to coordinate the prevention of fraud abuse. Although he testified that any fraudulent payments would be without his consent, the issues of consent and ownership are not the same. It is also true that Forrest testified he had authority to order that payment *not* be made *if* he were made aware of a fraudulent claim *prior* to payment. There obviously was no such exercise of authority in this case, as appellant was prosecuted for claims that *were* paid. Further, the authority to prevent payment of fraudulent claims is like the authority of the security guard in *McGee v. State*, supra, to stop shoplifters. There was no evidence that Forrest had a general power of care, control, custody or management over disbursement of the stolen funds; the last question in the excerpt above accurately describes his position as "guardian" of the funds. The exercise of true care, control, custody and management of the funds appears later in his testimony, where Forrest described how funds are actually paid:

"Q. Okay, sir, and would you explain to the Jury who that Medicaid claim form comes in to the system of Blue Cross-Blue Shield and how it is reviewed and paid or not paid?

"A. The claim forms are preprinted when we mail them out to the doctors showing their name and their provider number or doctor number.

"They are returned to us. They come to our mail room and are date stamped into our control unit where they're assigned an individual identification number and then forwarded to our claims examiners who review them for completeness.

"Then they go to our keypunch section and it enters the data from the claim forms into our computer system.

"The actual documents then go back into our file and the computer processes the data and issues the check."

This description shows that the actual care, custody, control and management of monies used for Medicaid payments is in the hands of the claims examiners, not Forrest, the program integrity specialist. The facts in *McGee v. State*, supra, are clearly analogous.

The defendant in *McGee* was charged with theft of property, belonging to Delene Dosher. The evidence showed that Dosher was a security guard in the store where the theft was committed and that her duties were "to watch out for and apprehend shoplifters, to take care of injured people, to file complaints if a shoplifter is caught, and to recover merchandise that is shoplifted." She did not have "care, custody, control or management" of the merchandise in the store. Likewise in this case, Forrest was "guardian" of the funds, with responsibilities, like those of a security guard, to protect against theft of the property of his employer. The "care, custody, control and management" of that property, on the other hand, was the responsibility of the claims examiners.

In its reply to this issue, the State asserts that the record shows Blue Cross-Blue Shield was the program underwriter, that Forrest was responsible for coordination of the systems to prevent fraud abuse, and that if money was fraudulently obtained it would be without Forrest's consent. The record does show these facts, yet, as shown above, none of these speak to the issue of whether Forrest had care, custody, control or management of the funds. The evidence simply does not show that Forrest was the owner, as alleged.

Because the evidence is insufficient, the conviction is set aside and the judgment is reformed to show an acquittal. *Burks v. U.S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1; *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15.

Before the court en banc.

## OPINION

## ON STATE'S MOTION FOR REHEARING

ROBERTS, Judge.

The appellant owned and operated the Dallas Weight Control Clinic with which Dr. Robert Craig was associated. Using Dr. Craig's Medicaid number and signature stamp the appellant submitted hundreds of Medicaid payment claims for medical services never rendered. These false claims were processed and paid by Blue Cross-Blue Shield which was underwriting the Medicaid program in Texas at that time. The appellant was found guilty of theft of $10,000 or over and punishment was assessed by the jury at confinement for 15 years and 1 day and a $10,000 fine.

The indictment alleged that the appellant,

"on or about the 9th day of December in the year of our Lord One Thousand Nine Hundred and Seventy-Five in the County and State aforesaid, did unlawfully, knowingly and intentionally exercise control over property, other than real property, to-wit: current money of the United States of America of the value of at least $10,000.00 without the effective consent of James P. Forrest, the owner thereof, and with intent to deprive James P. Forrest of said property, contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the State."

## I.

█ In her first ground of error, the appellant challenges the sufficiency of the evidence. Specifically, the appellant argues

that the evidence was insufficient to show that James P. Forrest was the owner of the stolen funds.

V.T.C.A., Penal Code, Sec. 1.07(a)(24) and (28) provide:

"'Owner' means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor."

"'Possession' means actual care, custody, control, or management."

Thus, the Code provides three separate means of establishing ownership: that the alleged owner had (1) title, (2) possession, or (3) a right to possession superior to that of the appellant. In the instant case it was undisputed that Blue Cross-Blue Shield, not Forrest, was title owner of the stolen property. The record also reflects that the trial court did not charge the jury on the third form of ownership—greater right to possession. Rather the court instructed the jury:

"before you find the defendant guilty as charged you must find from the evidence beyond a reasonable doubt that the said James P. Forrest did . . . have actual care, control, and management of the alleged property."

Therefore it was incumbent upon the State to have proved that Forrest had *possession* of the property in order to sustain its burden of proof upon the element of ownership.

With regard to this issue, Forrest testified as follows:

"Q. Mr. Forrest, how are you employed, sir?

"A. I'm employed by Blue Cross-Blue Shield of Texas.

"Q. And in what capacity, sir?

"A. I am program integrity specialist.

"Q. Would you briefly explain to the Jury what the primary function of your job is, sir?

"A. My responsibilities deal with fraud and abuse.

Internally I am responsible to see that our systems do not allow fraudulent claims to be paid. If they are detected before payment or something suspicious is detected before payment then it's brought to me for quick investigation and determination as to whether we should pay it or not.

If fraud is detected after payment then it's my responsibility to see that it is investigated and followed through to a final conclusion.

"Q. Mr. Forrest, if you were made aware of a fraudulent claim prior to this—do you have the authority, sir, to order that payment not be made?

"A. Yes, sir, I do.

"Q. Okay, and then if the assistant—let me ask you this.

Are you responsible for coordinating systems to prevent fraud abuse?

"A. Yes, sir, I am.

"Q. If your system failed and money is fraudulently obtained, that is obtained upon claims that should not be paid because services were not rendered as indicated on the forms, would that be without your consent, sir?

"A. Yes, sir, it would."

■ Possession may be proved by showing that the alleged owner controlled the property. *Cross v. State*, 590 S.W.2d 510 (Tex.Cr.App.1979). Forrest testified that he was authorized to stop payment on any Medicaid claim suspected of being fraudulent. We are of the opinion that his authority to suspend payment of Blue Cross-Blue Shield funds was sufficient control of the property to sustain the allegation of Forrest's ownership. The fact that others were also authorized to exercise control over the property in question does not preclude a finding that Forrest was an owner as that term is defined by Sec. 1.07(a)(24). See *Compton v. State*, 607 S.W.2d 246 (Tex. Cr.App.1980); *Cross v. State*, 590 S.W.2d 510 (Tex.Cr.App.1979). Exclusive control of the property need not be vested in the alleged owner. We hold that the evidence was sufficient to show that James P. Forrest was the owner of the stolen funds.

## II.

The appellant also challenges the sufficiency of the evidence that she filled out the claim forms, and endorsed the checks, which were admitted in evidence. A handwriting expert identified those questioned writings as the appellant's. He compared each of the questioned writings to one or more of four specimens: a signature which was stipulated to be the appellant's, two letters which the appellant had written in the presence of a witness, and an application for a bank loan.[1] The loan application bore a signature in the appellant's name and other writings consisting of financial and personal information. It was the expert's opinion, based on comparisons with the other specimens, that the appellant wrote the signature. He assumed that the other writings on the loan application were the appellant's as well. The appellant notes that there was only circumstantial evidence that the other writings on the loan application were hers. She says that the evidence of that fact was therefore insufficient, which, in turn, leaves insufficient the evidence that she wrote the questioned writings (on the claim forms and the checks).

■ The evidence that the appellant had written the other information on the loan application would not be insufficient simply because it was circumstantial. *See* J. Wigmore, 3 *Evidence*, Section 709(2)(a)(3) (J. Chadbourn rev. 1970) (genuineness of handwriting specimen may be proved by testimony directed to the jury like all ordinary evidence). In view of the facts that the loan application was signed by the applicant, that it was completed with information personal to her,[2] and that the jury could compare this specimen with other specimens whose genuineness is not contested, we find the evidence was sufficient to have permitted the jury to find that the writings on the loan application were the appellant's. *Cf. Herndon v. State*, 543 S.W.2d 109, 117–119 (Tex.Cr.App.1976) (writing carried by appellant was sufficiently similar to notebook that trier of fact could conclude that defendant had knowledge and control of notebook).

■ We also think that the genuineness of the loan application was not so crucial to the sufficiency of the evidence as the appellant would have us believe. The loan application was unique among the four specimens in that it contained numerals. There were many numerals on the hundreds of questioned claim forms and checks, but there also were many written words which the expert could (and did) compare with the concededly genuine specimens. The jury having been free to have made its comparisons among all these writings as well,[3] we hold that the evidence, when viewed in the light most favorable to the prosecution, was such that a rational trier of fact could have found beyond a reasonable doubt that the appellant filled out the claim forms and endorsed the checks.[4] *See Ex parte Watson*, 606 S.W.2d 902, 905 (Tex.Cr.App.1980); *Herndon v. State*, 543 S.W.2d 109, 118 (Tex. Cr.App.1976); *Salinas v. State*, 479 S.W.2d 913, 915 (Tex.Cr.App.1972).

## III.

■ The appellant challenges in several ways the theory on which this prosecution was brought. She argues that this case could have been prosecuted as a felony of

---

1. Also available was a sample which the court compelled the appellant to write, but the expert disregarded it because, in his opinion, the appellant was not writing normally.

2. This included name, age, home address, length of time living there, nearest relative, personal reference, employment, length of employment, monthly salary, previous employer, personal bank, name of landlord, amount of rent, description of automobile, schedule of debts, and security for loan (personal financial statement).

3. "It is competent to give evidence of handwriting by comparison, made by experts or by the jury. Proof by comparison only shall not be sufficient to establish the handwriting of a witness who denies his signature under oath." V.A.C.C.P. Art. 38.27.

   The appellant did not deny her signature under oath.

4. This standard provides due process, and it is applied by this court. *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Cr.App.1981).

the second degree (theft of property valued at $10,000 or more) only by aggregating many small amounts. The indictment gave no notice of such a theory, and the charge did not present it to the jury. The appellant argues at some length in her first ground of error that the State should have been required to have alleged that it was aggregating several amounts, and in her third ground she claims that the trial court erred in overruling her "exception" to the charge for failing to instruct the jury on Section 31.09 of the Penal Code:

"When amounts are obtained in violation of this [theft] chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense."

The appellant also says that the proof was at variance with the indictment and insufficient to prove that she stole over $10,000 on the date alleged.

The State denies that it relied on Section 31.09 or that it aggregated amounts. "The State's theory of the case then," says its brief at 3, "was that at a particular point in time Appellant unlawfully exercised control over at least $10,000 belonging to special owner James P. Forrest. Specifically, the State proved that Appellant had exercised control over $74,321 worth of checks from Blue Cross-Blue Shield by that date." No authority is cited for this theory.

While we agree with the State that the evidence was sufficient,[5] we cannot agree that it could prosecute this case as a felony of the second degree without pleading the aggregation element and submitting the issue to the jury.

Over the course of nearly a year, the appellant submitted hundreds of false claims that medical services had been rendered to as many patients on as many occasions, and Blue Cross-Blue Shield paid each claim. Many of these checks were for misdemeanor amounts (less than $200),[6] and

none of them was for an amount ($10,000 or more) that would have authorized punishment for a felony of the second degree.[7]

The law which applied to such a state of facts before and after the enactment of Section 31.09 of the Penal Code has been explained well:

"The common law restricted the scope of a theft to a single victim and a single time and place; if more than one victim or more than one time was involved, more than one theft was committed. The Texas Court of Criminal Appeals relaxed the common-law requirements only slightly in stating that 'When several articles or things in bulk are taken by continuous acts, there being one purpose, one impulse, the act is one without regard to time,' Cody v. State [31 Tex.Cr.R. 183], 20 S.W. 398 (Cr.App.1892).

"This section [31.09 of the Penal Code] represents a more substantial departure from the common law. It providees [sic] that, if an actor adopts and pursues a single 'scheme or continuing course of conduct' for acquiring property or services in a manner that constitutes theft, he may be convicted of a felony even though he is careful to limit the theft from each individual or at each time and place to a misdemeanor amount. This provision reflects the determination that the reprehensibility of an actor, and thus the appropriate penal sanction, is not necessarily determined by the amount he steals at a single moment from a single person. A swindler who sells 1,000 one dollar tickets to a nonexistent charitable function, for example, evidences the same disrespect for property rights as the embezzler who takes $1,000 from his employer or the car thief who steals a $1,000 automobile. Each intends to acquire valuable property illegally, and although the swindler harms no individual victim significantly, his harm to society is as great as that of the embezzler and the car thief. *Of*

5. *Reger v. State*, 598 S.W.2d 868, 871 (Tex.Cr. App.1980).

6. V.T.C.A., Penal Code Sec. 31.03(d)(3).

7. V.T.C.A., Penal Code Sec. 31.03(d)(5)(B).

*course, the prosecution will have to allege and prove each separate 'offense,' but the value of several items can now be combined for jurisdictional and punishment purposes."* S. Searcy & J. Patterson, "Practice Commentary," 3 *Vernon's Texas Codes Annotated—Penal Code* 571 (1974) (emphasis added).

The State effectively asks us to ignore both the prior law and the effect of Section 31.09 when it asks us to accept its theory of the case. It was settled long ago that a felony conviction could not be supported by proof that a defendant committed several misdemeanor thefts, even though he ultimately accumulated property of "felony value." *Lacey v. State,* 22 Tex.App. 657, 3 S.W. 343 (1887) (defendant committed "a series of constantly recurring thefts" of lumber, which aggregated more than the felony value; there was no proof that the felony value was taken on any occasion). There is no merit in the State's theory that, without relying on Section 31.09, it could support a conviction for a second-degree felony by proof that the appellant committed a series of misdemeanor and third-degree felony thefts at the conclusion of which she, at one time or another, "had exercised control over" more than the second-degree felony value. It is only by Section 31.09 that such an aggregation is allowed. This being so, was it necessary to have pleaded each theft and to have charged the jury on the law of Section 31.09? The answer is, Yes, as it was to two closely analogous questions.

■ The first question was whether it was necessary to plead, and to charge the jury on, Section 31.03(d)(4)(C) of the Penal Code, which prescribes third-degree felony punishment for theft that would otherwise be a misdemeanor if "the defendant has been previously convicted two or more times of any grade of theft. ..." This is a jurisdictional element of the offense which must be pleaded in the indictment. *Gant v. State,* 606 S.W.2d 867, 871–872 n. 9 (Tex.Cr.App.1980). The defendant is entitled to have the jury charged on this element. Id. at 871.

Section 31.09 is similar to Section 31.-03(d)(4)(C) in that it prescribes a higher

punishment for certain conduct, namely, obtaining amounts in violation of Chapter 31 "pursuant to one scheme or continuing course of conduct, whether from the same or several sources. ..." Only when it satisfies that condition may "the conduct ... be considered as one offense and the amounts aggregated in determining the grade of offense." Even more clearly than in *Gant,* supra, this condition is an element of the offense which the defendant may require the State to plead and the court to charge the jury.

The second analogous question arose under the exception to the rule that restricted the scope of a theft to a single time. That exception, mentioned in S. Searcy & J. Patterson, supra, is when "several articles or things in bulk are taken by continuous acts, there being but one purpose, one impulse. ..." *Cody v. State,* 31 Tex.Cr.R. 183, 184, 20 S.W. 398, 398 (1892).[8] When the prosecution is based on that exception, a defendant is entitled to an instruction on the exception. *Lockhead v. State,* 85 Tex.Cr.R. 459, 213 S.W. 653 (1919). Likewise, a defendant would be entitled to have the jury instructed on the newer exception created by Section 31.09 that thefts which are separate in time may be considered as one offense if they were "pursuant to one scheme or continuing course of conduct."

The trial court erred in overruling the appellant's "exception" to the charge for its failure to instruct the jury on the law of Section 31.09, which was an essential element of the offense. *The State's motion for rehearing is granted. The judgment is reversed and the cause is remanded.*

ONION, P. J., and TOM G. DAVIS, W.C. DAVIS, CLINTON and TEAGUE, JJ., join this opinion.

DALLY and McCORMICK, JJ., join in Parts I and II, but dissent from Part III.

ODOM, Judge, concurring in part and dissenting in part.

I concur in the reversal of appellant's conviction, but dissent to the remand of the cause. The judgment should be reformed to reflect an acquittal for reasons stated in the opinion on original submission. The evidence is insufficient to show James For-

---

**8.** Cody had embezzled 20 sacks of meal and sold them for a dollar a sack; he delivered them in 3 successive trips between a railroad car and the buyer's store. The court held that this could be one offense. Other examples given by the court include loading a wagon with basket after basket of cotton from a pile 30 yards away, and breaking into a store and carrying out by successive trips as many goods as are wanted.

rest was owner of the property as alleged. Forrest was no more in authority to control the property than was any policeman on the street, who, like Forrest, had a duty to stop any fraudulent taking of property. A duty to stop theft is not equivalent to care, control and management.