Kenneth Wayne GOODWIN, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–85–0202–CR.

Court of Appeals of Texas,
Tyler.

Aug. 31, 1987.
Rehearing Denied Oct. 30, 1987.

Jim Burnahm, Dallas, for appellant.

Jack Skeen, Jr., Dist. Atty., Tyler, for appellee.

SUMMERS, Chief Justice.

Appellant Kenneth Wayne Goodwin (Goodwin) was convicted by a jury of six counts of theft of property pursuant to one scheme and continuing course of conduct with an aggregate[1] value greater than $20,000.[2] The jury assessed punishment at ten years' confinement and a $10,000 fine. The jury recommended that Goodwin's confinement be probated for six years, but did not recommend probation of Goodwin's fine. We reverse and acquit in part, and reverse and remand in part for a new trial on punishment.

On August 20, 1974, Kenneth C. Miller died. In his will and codicils, he placed all of his assets, not otherwise disposed of, in trust for the benefit of Joanne Miller Glass[3] (Glass) during her lifetime with the remaining corpus of the trust to be divided equally among the children of Glass upon her death. Miller named Tyler Bank & Trust, now known as First RepublicBank (the Bank), and Ben Goodwin as co-trustees of this trust and co-independent executors of his estate. A chief asset of the estate and of the trust[4] was Miller Production Company (MPC). From 1974 until June 1984 MPC employed Goodwin to supervise production from oil and gas wells located on the Daisy Bradford Lease in Rusk County. Between January 1982 and January 1983 Goodwin six times presented invoices to Ben Goodwin and the Bank for payment, the invoices allegedly representing work performed on the Daisy Bradford Lease. The first invoice dated January 29, 1982, was in the amount of $8,700 for road work performed by TNG, Inc. (TNG) and was paid by check on February 5, 1982 (the proceeds of this check represent the funds alleged in count one of the indictment to have been stolen by Goodwin). The next two invoices, one dated August 13, 1982, in the amount of $3,107.50 and one dated August 19, 1982, in the amount of $1,832 for maintenance work on the lease performed by BS & W Oil Field Service Company (BS & W), and were paid by check on August 24, 1982 (the proceeds of this check represent the funds alleged in count two to have been stolen by Goodwin). The next invoice dated August 30, 1982, was for well maintenance performed by BS & W in the amount of $2,250, and was paid by check on September 3, 1982 (the proceeds of this check represent the funds alleged in count three to have been stolen by Goodwin). The next invoice dated October 13, 1982, was in the amount of $3,107.50 for repairs of a pumping unit performed by BS & W, and was paid by check on October 14, 1982 (the proceeds of this check represent the funds alleged in count four to have been stolen by Goodwin). The next invoice dated December 20, 1982, in the amount of $3,107.50 was also for pumping unit repairs performed by BS & W, and was paid by check on January 3, 1983 (the proceeds of this check represent the funds alleged in count five to have been stolen by Goodwin). The final invoice dated January 4, 1983, in the amount of $2,250 was for well maintenance performed by BS & W, and was paid on January 10, 1983 (the proceeds of this check represent the funds alleged in count six to have been stolen by Goodwin).

Goodwin brings thirty points of error. In his first twenty-four points of er-

---

1. Tex.Penal Code Ann. § 31.09 (Vernon 1974).

2. A second degree felony. Tex. Penal Code Ann. § 31.03(e)(5)(B) (Vernon Supp.1987).

3. Under the terms of the trust, Glass was to receive monthly distribution of a minimum of $1,000.

4. The estate and trust are administered as a single entity by Ben Goodwin and the Bank.

ror, Goodwin challenges the sufficiency of the evidence to support the conviction. In reviewing the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard must be applied to the evidence in light of a correct charge that corresponds to the indictment allegations. *Dunn v. State,* 721 S.W.2d 325, 332 (Tex.Cr.App. 1986); *Stephens v. State,* 717 S.W.2d 338, 339 (Tex.Cr.App.1986); *Benson v. State,* 661 S.W.2d 708, 714–715 (Tex.Cr.App.1982), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1983).

■ We shall first discuss the sufficiency of the evidence to support Goodwin's conviction under count one. In point of error nineteen, Goodwin asserts that the evidence is insufficient to establish that Glass was the special owner of the property appropriated by Goodwin in count one. Specifically, Goodwin asserts that the term "special owner" is a term of art meaning "a person who has actual care, custody or control of property as differentiated from a person who is an actual owner or who has equitable title in the property." We disagree. Tex.Penal Code Ann. § 1.07(a)(24) (Vernon 1974) defines "owner" as, "A person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor." Tex.Code Crim. Proc.Ann. art. 21.08 (Vernon 1966) provides, "When property belongs to the estate of a deceased person, the ownership may be alleged to be in the executor, administrator or heirs of such deceased, or in any one of such heirs." We construe that the word "heirs," as used in the statute, includes devisees and legatees under a will. These provisions eliminate the distinction between general and special owners. *Freeman v. State,* 707 S.W.2d 597, 603 (Tex.Cr. App.1986). Glass testified without objection that she was the principal beneficiary under her father's will and the life beneficiary of the Miller trust, that she receives monthly distributions from that estate, and that she never authorized payment for any

work not performed. If a "special owner" of property testifies without objection that she was the special owner of the property and had a greater right of possession to the property than the accused and the accused asserts no possessory interest in the property, then the evidence is clearly sufficient to show that she was the lawful owner of the property. *Freeman,* 707 S.W.2d at 603. Goodwin's nineteenth point of error is overruled.

■ In his first point of error, Goodwin asserts that the evidence is insufficient to support his conviction of theft as charged in count one. Specifically, Goodwin contends that since Ben Goodwin and the Bank (acting through I. Greenberg) signed the check and they were legally authorized to act for Glass, the State failed to prove that Goodwin appropriated the property without effective consent of the owner as defined in the charge. This argument is without merit. Having proved lack of consent of the owner (Glass) as alleged in the indictment, the State was not required to allege or prove want of consent of any other party claimed to have authority to give consent. *Fletcher v. State,* 396 S.W.2d 393, 395–396 (Tex.Cr.App.1965); *see Walker v. State,* 591 S.W.2d 493, 494 (Tex.Cr.App.1979); *Coney v. State,* 100 Tex.Cr.R. 380, 272 S.W. 197 (1925). Goodwin's first point of error is overruled.

■ In his thirteenth point of error, Goodwin asserts that the evidence is insufficient to support the jury's verdict that Goodwin took the check in count one by deception. In his seventh point of error, Goodwin asserts that the evidence is insufficient to support the jury's verdict as to count one in that there is no evidence that Goodwin appropriated the named check. We shall discuss these points together. C. Steven Green, co-owner of TNG, testified that in March of 1982, he asked Goodwin to repay $3,000 that he had loaned Goodwin; that Goodwin said that he could not repay that money this month; that Goodwin also stated that the only way he could repay Green was if TNG submitted a fraudulent invoice to MPC; that thereafter TNG sub-

mitted a fraudulent invoice to MPC for $8,700; that MPC sent TNG a check for $8,700 which Green deposited in TNG's account; that Green subsequently gave Goodwin a check for $6,500, and wrote a check to himself for $2,200; and that neither Green, his partner Turner, nor TNG performed the work invoiced. Goodwin testified that he had hired TNG to perform the road work invoiced; that MPC had paid TNG in advance $8,700 for the work; that TNG had abandoned the project; that Green only refunded $6,500 of the money because that was all the money that TNG had; that Goodwin agreed to personally finish the job as satisfaction for the debt he owed Green; and that he had personally performed the road work invoiced and personally retained the $6,500 returned by Green. Mrs. Laura Finley, who lived next to the entrance to the Daisy Bradford leases, testified that in 1982, she had observed Goodwin repairing the roads into the Daisy Bradford lease, and that Goodwin had stored road equipment on her property. Charles Childers, President of the Bank, however, testified that Kenco, a company owned by Goodwin, had in 1982 submitted several invoices for road work performed on the entrance to the Daisy Bradford lease and that these invoices had been paid by MPC. The invoices submitted by Kenco and the invoice submitted by TNG were for the same work. Therefore, we conclude, after viewing the evidence in the light most favorable to the prosecution, that a rational trier of fact could have found beyond a reasonable doubt that Goodwin had appropriated the property set forth in count one. Goodwin's seventh and thirteenth points of error are overruled.

 Next we shall consider the sufficiency of the evidence to support Goodwin's conviction under counts two through six. In points of error fourteen through eighteen, Goodwin asserts that the evidence is insufficient to support the jury's verdict that he took the checks in counts two through six by deception. We agree. Shirley Vest, Goodwin's secretary, testified that she had typed at least two of the invoices submitted by BS & W to MPC; that she had copied one of these invoices

verbatim from an invoice previously submitted to MPC by Jack Craig Electrical Contractor; that she had typed the other invoice from an invoice handwritten by Goodwin; and that she had typed these invoices at Goodwin's direction, but that she had no knowledge whether or not the work represented by the invoices had, in fact, been performed. The State also introduced deposit slips from K/G Oil Company and Southeastern Oil Company, each company owned by Goodwin, indicating payments received from BS & W in approximately the same amount and at the same time as BS & W received payment from MPC. The State, however, failed to connect the payments made by MPC to BS & W to the payments by BS & W to K/G Oil and Southeastern Oil. Billie Stevens, the widow of Benoit Stevens, testified that she had never heard her husband mention that he owned BS & W; that her husband had never had any employees or oilfield equipment; that she had never seen any invoices in her house and that she had never heard of BS & W until she found the BS & W checkbook in her husband's truck, but that her husband could have had a sideline without her knowing it. Rex L. Stevens, the son of Benoit Stevens, testified that he had never heard of BS & W; that to the best of his knowledge, his father had never owned a company known as BS & W; that the phone number listed on the BS & W's invoice was Jack Craig's phone number; that Jack Craig approached him twice about BS & W's business; and that his father never talked business. Carl Mitchell, a former employee of Goodwin's, testified that on one occasion in 1983, he had taken a BS & W invoice out to Stevens to sign; and that Stevens had signed the invoice, but that Stevens said that he would not sign any more invoices because he had not "been able to keep any of this."

Robert Williamson, a well operator familiar with the Daisy Bradford Lease, testified that the work invoiced by BS & W would probably have needed to be done on the Daisy Bradford Lease, and that in 1984, much of the work invoiced had apparently been recently performed. Goodwin testi-

fied that he had helped Stevens form BS & W so that Stevens could earn extra money; that the work performed by BS & W was not work ordinarily done by a pumper such as Stevens; that he had no doubt that the work had in fact been done by Stevens; that each invoice was signed by Stevens; that when Stevens signed an invoice, Stevens guaranteed that the work had been done; that he had told his secretary to type the invoices for Stevens; that he had told his secretary to type one of the invoices for Stevens from an invoice submitted by Jack Craig because the work done by BS & W was the same as the work performed by Craig; that he had handwritten the copy of one of the invoices because Stevens had phoned in the invoice; that the checks from BS & W to K/G Oil and Southeastern Oil constituted repayments of loans made by Goodwin to Stevens; and that he had no idea where BS & W had obtained the funds to repay him. Having reviewed the evidence in the light most favorable to the prosecution, we cannot conclude that a rational trier of fact could have found beyond a reasonable doubt that the work invoiced in counts two through six was not performed. We conclude, therefore, that the evidence is insufficient to support Goodwin's conviction under counts two through six. Goodwin's fourteenth through eighteenth points of error are sustained.

▮ In his twenty-seventh point of error, Goodwin asserts that he was convicted of seven counts in a single indictment in violation of the double jeopardy provision of the state and federal constitutions. In his twenty-eighth point of error, Goodwin asserts that he was charged, tried, and convicted for conduct which was not an offense against the laws of the State of Texas. In his twenty-ninth point of error, Goodwin asserts that the charge to the jury was fundamentally defective in that it permitted the jury to convict the appellant for each count in the indictment. We shall discuss these points together. Tex.Penal Code Ann. § 31.09 (Vernon 1974) provides when several counts of theft are committed pursuant to one scheme or continuing course of conduct, they may be considered as one offense and the amounts aggregat-

ed in determining the grade of the offense. In this case, the indictment alleged six counts of theft, and in the final paragraph asserted that each count was obtained pursuant to one scheme and continuing course of conduct and the aggregate amount of such amounts stolen was greater than $20,-000. The court's charge authorized the jury to find Goodwin guilty of each count alleged in the indictment, and further required that they find that Goodwin had committed the offenses pursuant to one scheme and continuing course of conduct. Therefore, the indictment and charge complied with the provisions of Tex.Penal Code Ann. § 31.09 (Vernon 1974). *See Turner v. State*, 636 S.W.2d 189, 196 (Tex.Cr.App. 1980); *Tucker v. State*, 556 S.W.2d 823, 824–26 (Tex.Cr.App.1977). Goodwin's twenty-seventh through twenty-ninth points of error are overruled.

In light of our disposition of the previous points of error, we need not address Goodwin's remaining points of error.

We reverse the convictions of Goodwin of the offenses charged in counts two through six of the indictment, and order an acquittal as to those charges. The conviction charged under count one is reversed, and the cause as to that count of the indictment is remanded for a new trial on the issue of punishment under said count, as provided in Tex.Code Crim.Proc.Ann. art. 44.29(b) as amended.[5]

---

**5.** Act of May 26, 1987, ch. 179, § 1, 1987 Tex. Gen. Laws 2711–2713.