

# NUMBER 13-07-00675-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**DARRELL KENNETH WOODS JR., A/K/A**
**DARELL KENNETH WOODS, A/K/A**
**DARRYL KENNETH WOODS,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

### On appeal from the 138th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

### Before Justices Yañez,[1] Garza, and Benavides
### Memorandum Opinion by Justice Garza

A Cameron County jury convicted appellant, Darrell Kenneth Woods Jr., A/K/A

---

[1] The Honorable Linda Reyna Yañez, former Justice of this Court, was a member of the panel at the time this case was argued and submitted for decision, but did not participate in deciding the case because her term of office expired on December 31, 2010. *See* TEX. R. APP. P. 41.1.

Darell Kenneth Woods, A/K/A Darryl Kenneth Woods of theft of property with a value of $100,000 or more but less than $200,000, a second-degree felony. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(6) (West Supp. 2010). The trial court sentenced Woods to five years' imprisonment, with the sentence suspended and community supervision imposed for ten years. By ten issues, which we reorganize as six, Woods argues that: (1) the sentence violates constitutional separation of powers; (2) the evidence was legally and factually insufficient to support his conviction; (3) the trial court erred in admitting evidence of an extraneous offense; (4) he is entitled to a new trial because the reporter's trial record has "effectively been lost"; (5) there is a fatal variance between the allegations in the indictment and the proof presented; and (6) the State impermissibly "aggregate[d] proof without having pleaded a continuing course of conduct" in the indictment. We reverse and render a judgment of acquittal.

## I. BACKGROUND

The indictment filed on August 16, 2006 alleged that Woods,

> on or about the **22nd** day of **December, 2005**, and anterior to the presentment of this indictment, in the County of Cameron and State of Texas, did then and there unlawfully appropriate, by acquiring or otherwise exercising control over, property, to-wit: **United States Currency**, of the value of **$100,000.00 or more but less than $200,000.00**, from **Jim TIPTON**, the owner thereof, with intent to deprive the owner of the property . . . .

Trial testimony revealed that Woods reached an agreement in 2005 with Tipton Motors ("Tipton"), a company operating a Ford dealership in Brownsville, Texas, under which Woods would purchase and sell cars on the wholesale market. Woods typically purchased vehicles at auctions and other dealerships using Tipton's money; he would then attempt to sell the cars at a higher price to other retail dealerships. Woods also

would attempt to sell used vehicles that Tipton had acquired via customer trade-ins. Tipton gave Woods the authority to write checks on its bank account in order to make purchases at auctions. If Woods was successful in selling the cars he acquired, he would pay back the original purchase price to Tipton, and he and Tipton would then split any remaining profit according to the terms of their agreement.

Rodney Herring, Tipton's general manager, testified that in October 2005, Woods approached Herring and Tipton's owner, Jim Tipton, about purchasing cars from Tipton's inventory to sell to other retail dealerships in other parts of the state. According to Herring, Tipton would reassign the titles to vehicles to Woods in exchange for "sight drafts," which are bank drafts that are payable on demand. *See Temple-Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 797 (Tex. 1984). The sight drafts had the words "Call For Check" written on them, indicating that Woods would pay by check once he obtained the funds. Herring explained further:

| Q. [Prosecutor] | Now at the time that this relationship changed, you were giving [Woods] titles and he was giving you the sight drafts, right? |
|---|---|
| A. [Herring] | Right. |
| Q. | Okay. How many cars did he take from you in this fashion? |
| A. | Probably, 25. I would guess. |
| Q. | And with those first few cars, . . . were there any problems with what was going on? |
| A. | No, sir. |
| Q. | Okay. When it said "Called [sic] For Check," on the sight draft, what procedures did you all take to get paid? |

A.                When we would get the title we would give it to Mr. Woods and we would ask for a check.

. . . .

Q.                Then something else happened?

A.                Right.

Q.                What else happened?

A.                We quit getting paid.

Q.                Okay. Tell us how you first discovered that was happening?

A.                Kind of by accident. I was having lunch at Shoney's with a friend that works with me. And some folks from another dealership just approached me and asked me if I was doing business with a something Woods—or "Wood." And I said, "No, I don't think so." And they described him physically to me. And I said, "Well, maybe I am." And they proceeded to tell me stories about the dealings that their store had had with him. And [they] just said, "Look. You might want to look at your books, and just double check things."

. . . .

I went back to the store and started looking at our wholesaler receivable schedules, and basically—just making sure that I collected the money that was due.

Q.                Would you say from your end, your relationship with Mr. Woods changed at that point?

A.                Yes, sir.

Q.                In what way did it change?

A.                Well, I became a bill collector.

Q.                Okay. And summarizing the relationship you had with him through the ongoing ones, just in summary, what happened? Did you ever collect?

4

A.                          Ah—we collected some, yes; we did not collect all.

The prosecutor asked Herring about nine specific vehicles that were allegedly resold by Woods but for which Woods did not pay Tipton. As to each of the vehicles, Herring testified that either: (1) Tipton called Woods for the check representing the proceeds from the sale of the vehicle, as instructed on the sight drafts, but Woods never produced the check; or (2) Woods purchased the vehicle using a check drawn on Tipton's account, but never paid back those amounts after having resold the vehicle.

State's exhibit number sixteen, a demonstrative exhibit, detailed Herring's prior testimony as to "all of the transactions at the prices that [Tipton] sold them for." Herring agreed with the prosecutor that the figures on exhibit sixteen represented "what [Tipton] gave [the cars] to . . . Woods for." Exhibit sixteen consisted entirely of the following chart:

| 2006 DATE | YEAR | DESCRIPTION | STOCK# | AMOUNT |
|---|---|---|---|---|
| 22-Dec | 2002 | EXCURSION | EA85830 | 21500.00 |
| 20-Dec | 2001 | F-150 | NB02469A | 7500.00 |
| 29-Dec | 2002 | F-150 | KC43985 | 11500.00 |
| 24-Jan | 2001 | EXPLORER | UA39513 | 5000.00 |
| 24-Jan | 2004 | F-150 | KA10257 | 21500.00 |
| 27-Jan | 2005 | FREESTYLE | GA32521 | 19000.00 |
| 24-Mar | 1999 | CONTOUR | K190857 | 2000.00 |
| 19-Nov | 2000 | DODGE | F149984 | 5820.00 |
| 19-Nov | 1999 | F350 | EE50736 | 12020.00 |
| 6-Jun | | | 7851 | -2000.00 |
| 11-Nov | | | 11748 | -5900.00 |
| | | | | _____ |
| | | TOTAL | | 97940.00 |

According to Herring, the two negative numbers appearing at the bottom of the "AMOUNT" column in exhibit sixteen represented sums that were received by Tipton from "Buggy's," a used car dealership located in San Benito, Texas, for the 1999 Contour

and 2000 Dodge vehicles. Herring stated on cross-examination that Woods sold those two cars to Buggy's but did not provide Buggy's with the title to the cars, which remained with Tipton. Tipton did not deliver the titles to Buggy's until Buggy's paid the amounts listed as negative figures on exhibit sixteen. The owner of Buggy's testified that he paid twice for both the 1999 Contour and 2000 Dodge: once to Woods for the car itself, and once to Tipton for the title. Herring emphasized that the two payments were made by Buggy's and not by Woods and that, if the negative amounts were removed, the "TOTAL" amount listed would exceed $100,000.

Woods testified in his own defense. Defense counsel presented documents to Woods which Woods testified were "control detail reports" and "recap sheets" produced by Tipton with respect to several of the vehicles. According to Woods, a recap sheet "recaps [the dealership's] profit or losses" with respect to a particular car. Woods stated that the recap sheet for 2001 F-150 reflected that Tipton incurred a $1,000 loss on that vehicle. Woods stated that this was because Tipton purchased the truck for $8,500 but later sold it to Woods for only $7,500. Woods agreed with defense counsel that, "had [Woods] not paid for this vehicle," Tipton's loss as reflected on the recap sheet should have been the entire $8,500 that Tipton originally paid out. Woods further testified that the recap sheets for the 2001 Explorer, 2004 F-150, 2005 Freestyle, 1999 Contour, and 2002 F-150 reflected that Tipton earned profits of $6,000, $1,000, $1,715.75, $1,050, and $1,500 on those vehicles, respectively. As to each of the vehicles, Woods testified that, had he not paid Tipton as promised, the recap sheets would have reflected losses instead of profits. Woods flatly denied that he owed any money to Tipton.

The jury was instructed only as to the second-degree felony offense of theft of

property with a value of $100,000 or more but less than $200,000. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(6). The jury charge tracked the indictment. No lesser-included offense was included in the jury charge, and neither the State nor the defense objected to the charge. Woods was convicted and sentenced to five years' imprisonment with the sentence probated for ten years. This appeal followed.

## II. DISCUSSION

By his second issue on appeal, Woods argues that the evidence was insufficient to support his conviction.[2] In determining whether evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt, we apply only a legal-sufficiency standard. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under such a standard, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and

---

[2] We note that Woods did not challenge the sufficiency of the evidence at the trial court by either a motion for directed verdict, motion for judgment notwithstanding the verdict, or motion for new trial. However, it is not necessary to preserve such challenges for appeal. *See Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001) ("A claim regarding sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so.") (citing *Proctor v. State*, 967 S.W.2d 840, 842 (Tex. Crim. App. 1998); *Lemell v. State*, 915 S.W.2d 486, 490 (Tex. Crim. App. 1995); 40 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 3.65 (Supp. 2000)); *see also McFarland v. State*, 930 S.W.2d 99, 100 (Tex. Crim. App. 1996) ("An appellate court must always address challenges to the sufficiency of the evidence.").

we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* Under a hypothetically correct jury charge, Woods committed the indicted offense if he: (1) unlawfully appropriated United States currency; (2) with a value of $100,000 or more but less than $200,000; (3) with intent to deprive Tipton of that property. *See* TEX. PENAL CODE ANN. § 31.03(a). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2003).

Penal code section 31.09 provides that, "[w]hen amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." TEX. PENAL CODE ANN. § 31.09 (West 2003). In *Whitehead v. State*, the court of criminal appeals stated:

> [E]verything that must be proved must be pleaded in the indictment. . . . Since the State may aggregate the values of particular items of property only if that property was taken during a continuing course of conduct, *the State must allege that the property was so taken* in the indictment. Thus, . . . the allegation that the values of the property taken were aggregated because that property was taken pursuant to a continuing course of conduct *is an element of the offense and must be included in the indictment*.

8

. . . .

> Moreover, since [penal code section 31.09] says that "the conduct may be considered as one offense," each separate theft need not be alleged. Rather, the offenses may be aggregated according to [section 31.09] as long as the offenses were committed pursuant to the same scheme or one continuous course of conduct, and the proper allegations are included in the charging instrument.

745 S.W.2d 374, 376-77 (Tex. Crim. App. 1988) (emphases in original) (citing *Turner v. State*, 636 S.W.2d 189 (Tex. Crim. App. 1980)).

In the instant case, the indictment does not allege that the total amount appropriated—between $100,000 and $200,000—was obtained by aggregating the values of property stolen pursuant to one "continuing course of conduct" or scheme. *See id.* Moreover, the State did not allege or prove that any single item of property appropriated by Woods had a value exceeding $100,000.

As the court of criminal appeals held in *Thomason v. State*, "[o]nly when an indictment additionally alleges that the property was taken 'pursuant to one scheme or continuing course of conduct,' does the indictment charge an aggregated theft under [section] 31.09." 892 S.W.2d 8, 11 (Tex. Crim. App. 1994). Here, as in *Thomason*, "the indictment charged an offense of theft under [section] 31.03 and the State was committed to that theory of prosecution." *Id.* at 12. Therefore, while the evidence may have been sufficient to show that Woods stole various items of property, the aggregated values of which exceeded $100,000, that was not the offense charged by the State. The only offense charged was theft of a single item worth more than $100,000, which the State did not even attempt to prove. The evidence was legally insufficient to support Woods's conviction of that offense. *See Jackson*, 443 U.S. at 319; *Sanders*, 119

9

S.W.3d at 820.

Woods's second issue is sustained.   Because this issue is dispositive, we need not address Woods's remaining issues.

### III.   CONCLUSION

We reverse the judgment of the trial court and render judgment of acquittal.


DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P.47.2(B)

Delivered and filed the
26th day of May, 2011.