NUMBER 13-07-00675-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI – EDINBURG

                           
                                       

 

DARRELL KENNETH WOODS JR., A/K/A

DARELL KENNETH WOODS, A/K/A

DARRYL KENNETH WOODS,                             
Appellant,

 

v.

 

THE STATE OF TEXAS,                                   
Appellee.

                           
                                       

 

On appeal from the 138th
District Court

of Cameron County,
Texas.

       
                                                           

 

MEMORANDUM OPINION

 

                    Before
Justices Yañez,[1]
Garza, and Benavides

                          Memorandum
Opinion by Justice Garza

 

            A
Cameron County jury convicted appellant, Darrell Kenneth Woods Jr., A/K/A
Darell Kenneth Woods, A/K/A Darryl Kenneth Woods of theft of property with a
value of $100,000 or more but less than $200,000, a second-degree felony.  See
Tex. Penal Code Ann. § 31.03(a),
(e)(6) (West Supp. 2010).  The trial court sentenced Woods to five years’
imprisonment, with the sentence suspended and community supervision imposed for
ten years.  By ten issues, which we reorganize as six, Woods argues that:  (1)
the sentence violates constitutional separation of powers; (2) the evidence was
legally and factually insufficient to support his conviction; (3) the trial
court erred in admitting evidence of an extraneous offense; (4) he is entitled
to a new trial because the reporter’s trial record has “effectively been lost”;
(5) there is a fatal variance between the allegations in the indictment and the
proof presented; and (6) the State impermissibly “aggregate[d] proof without
having pleaded a continuing course of conduct” in the indictment.  We reverse
and render a judgment of acquittal.

I.  Background

            The
indictment filed on August 16, 2006 alleged that Woods,

on or about the 22nd day of December,
2005, and anterior to the presentment of this indictment, in the County of
Cameron and State of Texas, did then and there unlawfully appropriate, by
acquiring or otherwise exercising control over, property, to-wit:  United
States Currency, of the value of $100,000.00 or more but less than
$200,000.00, from Jim TIPTON, the owner thereof, with intent to deprive
the owner of the property . . . .

 

Trial
testimony revealed that Woods reached an agreement in 2005 with Tipton Motors
(“Tipton”), a company operating a Ford dealership in Brownsville, Texas, under
which Woods would purchase and sell cars on the wholesale market.  Woods
typically purchased vehicles at auctions and other dealerships using Tipton’s
money; he would then attempt to sell the cars at a higher price to other retail
dealerships.  Woods also would attempt to sell used vehicles that Tipton had
acquired via customer trade-ins.  Tipton gave Woods the authority to write
checks on its bank account in order to make purchases at auctions.  If Woods
was successful in selling the cars he acquired, he would pay back the original
purchase price to Tipton, and he and Tipton would then split any remaining
profit according to the terms of their agreement.

Rodney
Herring, Tipton’s general manager, testified that in October 2005, Woods
approached Herring and Tipton’s owner, Jim Tipton, about purchasing cars from
Tipton’s inventory to sell to other retail dealerships in other parts of the
state.  According to Herring, Tipton would reassign the titles to vehicles to
Woods in exchange for “sight drafts,” which are bank drafts that are payable on
demand.  See Temple-Eastex, Inc. v. Addison Bank, 672 S.W.2d 793, 797
(Tex. 1984).  The sight drafts had the words “Call For Check” written on them,
indicating that Woods would pay by check once he obtained the funds.  Herring
explained further:

Q.
[Prosecutor]          Now at the time that this relationship changed, you were
giving [Woods] titles and he was giving you the sight drafts, right?

                        

A. [Herring]                Right.

 

Q.                                Okay. 
How many cars did he take from you in this fashion?

 

A.                                Probably,
25.  I would guess.

 

Q.                                And
with those first few cars, . . . were there any problems with what was going
on?

 

A.                                No,
sir.

 

Q.                                Okay. 
When it said “Called [sic] For Check,” on the sight draft, what procedures did
you all take to get paid?

 

A.                                When
we would get the title we would give it to Mr. Woods and we would ask for a
check.

 

. . . .

 

Q.                                Then
something else happened?

 

A.                                Right.

 

Q.                                What
else happened?

 

A.                                We
quit getting paid.

 

Q.                                Okay. 
Tell us how you first discovered that was happening?

 

A.                                Kind
of by accident.  I was having lunch at Shoney’s with a friend that works with
me.  And some folks from another dealership just approached me and asked me if
I was doing business with a something Woods—or “Wood.”  And I said, “No, I
don’t think so.”  And they described him physically to me.  And I said, “Well,
maybe I am.”  And they proceeded to tell me stories about the dealings that
their store had had with him.  And [they] just said, “Look.  You might want to
look at your books, and just double check things.” 

 

. . . .

 

I went back to the store and started
looking at our wholesaler receivable schedules, and basically—just making sure
that I collected the money that was due.

 

Q.                                Would
you say from your end, your relationship with Mr. Woods changed at that point?

 

A.                                Yes,
sir.

 

Q.                                In
what way did it change?

 

A.                                Well,
I became a bill collector.

 

Q.                                Okay. 
And summarizing the relationship you had with him through the ongoing ones,
just in summary, what happened?  Did you ever collect?

 

A.                                Ah—we
collected some, yes; we did not collect all.

 

The prosecutor
asked Herring about nine specific vehicles that were allegedly resold by Woods
but for which Woods did not pay Tipton.  As to each of the vehicles, Herring
testified that either:  (1) Tipton called Woods for the check representing the
proceeds from the sale of the vehicle, as instructed on the sight drafts, but
Woods never produced the check; or (2) Woods purchased the vehicle using a
check drawn on Tipton’s account, but never paid back those amounts after having
resold the vehicle.

State’s
exhibit number sixteen, a demonstrative exhibit, detailed Herring’s prior
testimony as to “all of the transactions at the prices that [Tipton] sold them
for.”  Herring agreed with the prosecutor that the figures on exhibit sixteen
represented “what [Tipton] gave [the cars] to . . . Woods
for.”  Exhibit sixteen consisted entirely of the following chart:


 
 
 2006
 DATE
 
 
 YEAR
 
 
 DESCRIPTION
 
 
 STOCK#
 
 
 AMOUNT
 
 
 
 
 22-Dec
 
 
 2002
 
 
 EXCURSION
 
 
 EA85830
 
 
 21500.00
 
 
 
 
 20-Dec
 
 
 2001
 
 
 F-150
 
 
 NB02469A
 
 
 7500.00
 
 
 
 
 29-Dec
 
 
 2002
 
 
 F-150
 
 
 KC43985
 
 
 11500.00
 
 
 
 
 24-Jan
 
 
 2001
 
 
 EXPLORER
 
 
 UA39513
 
 
 5000.00
 
 
 
 
 24-Jan
 
 
 2004
 
 
 F-150
 
 
 KA10257
 
 
 21500.00
 
 
 
 
 27-Jan
 
 
 2005
 
 
 FREESTYLE
 
 
 GA32521
 
 
 19000.00
 
 
 
 
 24-Mar
 
 
 1999
 
 
 CONTOUR
 
 
 K190857
 
 
 2000.00
 
 
 
 
 19-Nov
 
 
 2000
 
 
 DODGE
 
 
 F149984
 
 
 5820.00
 
 
 
 
 19-Nov
 
 
 1999
 
 
 F350
 
 
 EE50736
 
 
 12020.00
 
 
 
 
 6-Jun
 
 
  
 
 
  
 
 
 7851
 
 
 -2000.00
 
 
 
 
 11-Nov
 
 
  
 
 
  
 
 
 11748
 
 
 -5900.00
 
 
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 –––––––––––
 
 
 
 
  
 
 
  
 
 
 TOTAL
 
 
  
 
 
 97940.00
 
 


 

According to
Herring, the two negative numbers appearing at the bottom of the “AMOUNT”
column in exhibit sixteen represented sums that were received by Tipton from
“Buggy’s,” a used car dealership located in San Benito, Texas, for the 1999
Contour and 2000 Dodge vehicles.  Herring stated on cross-examination that
Woods sold those two cars to Buggy’s but did not provide Buggy’s with the title
to the cars, which remained with Tipton.  Tipton did not deliver the titles to
Buggy’s until Buggy’s paid the amounts listed as negative figures on exhibit
sixteen.  The owner of Buggy’s testified that he paid twice for both the 1999
Contour and 2000 Dodge:  once to Woods for the car itself, and once to Tipton
for the title.  Herring emphasized that the two payments were made by Buggy’s
and not by Woods and that, if the negative amounts were removed, the “TOTAL”
amount listed would exceed $100,000.

Woods
testified in his own defense.  Defense counsel presented documents to Woods
which Woods testified were “control detail reports” and “recap sheets” produced
by Tipton with respect to several of the vehicles.  According to Woods, a recap
sheet “recaps [the dealership’s] profit or losses” with respect to a particular
car.  Woods stated that the recap sheet for 2001 F-150 reflected that Tipton
incurred a $1,000 loss on that vehicle.  Woods stated that this was because
Tipton purchased the truck for $8,500 but later sold it to Woods for only
$7,500.  Woods agreed with defense counsel that, “had [Woods] not paid for this
vehicle,” Tipton’s loss as reflected on the recap sheet should have been the
entire $8,500 that Tipton originally paid out.  Woods further testified that
the recap sheets for the 2001 Explorer, 2004 F-150, 2005 Freestyle, 1999
Contour, and 2002 F-150 reflected that Tipton earned profits of $6,000, $1,000,
$1,715.75, $1,050, and $1,500 on those vehicles, respectively.  As to each of
the vehicles, Woods testified that, had he not paid Tipton as promised, the
recap sheets would have reflected losses instead of profits.  Woods flatly
denied that he owed any money to Tipton.

The
jury was instructed only as to the second-degree felony offense of theft of
property with a value of $100,000 or more but less than $200,000.  See Tex. Penal Code Ann. § 31.03(a),
(e)(6).  The jury charge tracked the indictment.  No lesser-included offense
was included in the jury charge, and neither the State nor the defense objected
to the charge.  Woods was convicted and sentenced to five years’ imprisonment
with the sentence probated for ten years.  This appeal followed.

II. 
Discussion

            By
his second issue on appeal, Woods argues that the evidence was insufficient to
support his conviction.[2] 
In determining whether evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable doubt,
we apply only a legal-sufficiency standard.  Brooks v. State, 323 S.W.3d
893, 895 (Tex. Crim. App. 2010).  Under such a standard, we consider the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979);
see Sanders v. State, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003).  We
give deference to “the responsibility of the trier of fact to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.”  Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson, 443 U.S. at 318-19). 
When faced with conflicting evidence, we presume that the trier of fact
resolved any such conflict in favor of the prosecution, and we defer to that
resolution.  State v. Turro, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency
of the evidence is measured by the elements of the offense as defined by a
hypothetically correct jury charge.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997).  Such a charge would be one that accurately sets out
the law, is authorized by the indictment, does not unnecessarily increase the State’s
burden of proof or unnecessarily restrict the State’s theories of liability,
and adequately describes the particular offense for which the defendant was
tried.  Id.  Under
a hypothetically correct jury charge, Woods committed the indicted offense if
he:  (1) unlawfully appropriated United States currency; (2) with a value of $100,000
or more but less than $200,000; (3) with intent to deprive Tipton of that
property.  See Tex. Penal Code
Ann. § 31.03(a).  Appropriation of property is unlawful if it is without
the owner’s effective consent.  Id. § 31.03(b)(1).  “A person acts
intentionally, or with intent, with respect to the nature of his conduct or to
a result of his conduct when it is his conscious objective or desire to engage
in the conduct or cause the result.”  Id. § 6.03(a) (West 2003).

Penal
code section 31.09 provides that, “[w]hen amounts are obtained in violation of
this chapter pursuant to one scheme or continuing course of conduct, whether
from the same or several sources, the conduct may be considered as one offense
and the amounts aggregated in determining the grade of the offense.”  Tex. Penal Code Ann. § 31.09 (West
2003).  In Whitehead v. State, the court of criminal appeals stated:

[E]verything that must be proved must
be pleaded in the indictment. . . .  Since the State
may aggregate the values of particular items of property only if that property
was taken during a continuing course of conduct, the State must allege that
the property was so taken in the indictment.  Thus, . . . the
allegation that the values of the property taken were aggregated because that
property was taken pursuant to a continuing course of conduct is an element
of the offense and must be included in the indictment.

 

. . . .

 

Moreover, since [penal code section
31.09] says that “the conduct may be considered as one offense,” each separate
theft need not be alleged.  Rather, the offenses may be aggregated according to
[section 31.09] as long as the offenses were committed pursuant to the same
scheme or one continuous course of conduct, and the proper allegations are
included in the charging instrument.

 

745 S.W.2d
374, 376-77 (Tex. Crim. App. 1988) (emphases in original) (citing Turner v.
State, 636 S.W.2d 189 (Tex. Crim. App. 1980)).

In
the instant case, the indictment does not allege that the total amount appropriated—between
$100,000 and $200,000—was obtained by aggregating the values of property stolen
pursuant to one “continuing course of conduct” or scheme.  See id. 
Moreover, the State did not allege or prove that any single item of property
appropriated by Woods had a value exceeding $100,000.

As
the court of criminal appeals held in Thomason v. State, “[o]nly when an
indictment additionally alleges that the property was taken ‘pursuant to one
scheme or continuing course of conduct,’ does the indictment charge an
aggregated theft under [section] 31.09.”  892 S.W.2d 8, 11 (Tex. Crim. App.
1994).  Here, as in Thomason, “the indictment charged an offense of
theft under [section] 31.03 and the State was committed to that theory of
prosecution.”  Id. at 12.  Therefore, while the evidence may have been
sufficient to show that Woods stole various items of property, the aggregated
values of which exceeded $100,000, that was not the offense charged by the
State.  The only offense charged was theft of a single item worth more than
$100,000, which the State did not even attempt to prove.  The evidence was
legally insufficient to support Woods’s conviction of that offense.  See Jackson,
443 U.S. at 319; Sanders, 119 S.W.3d at 820.

Woods’s
second issue is sustained.  Because this issue is dispositive, we need not
address Woods’s remaining issues.

III. 
Conclusion

We
reverse the judgment of the trial court and render judgment of acquittal.

 

 

DORI
CONTRERAS GARZA,

Justice

 

Do not publish.

Tex. R. App.
P.47.2(b)

 

Delivered and filed the

26th day of May, 2011. 

 









[1] The Honorable Linda Reyna Yañez, former
Justice of this Court, was a member of the panel at the time this case was
argued and submitted for decision, but did not participate in deciding the case
because her term of office expired on December 31, 2010.  See Tex. R. App. P. 41.1.





[2] We note that Woods did not challenge the sufficiency of the
evidence at the trial court by either a motion for directed verdict, motion for
judgment notwithstanding the verdict, or motion for new trial.  However, it is
not necessary to preserve such challenges for appeal.  See Rankin v. State,
46 S.W.3d 899, 901 (Tex. Crim. App. 2001) (“A claim regarding sufficiency of
the evidence need not be preserved for review at the trial level and is not
waived by the failure to do so.”) (citing Proctor v. State, 967 S.W.2d
840, 842 (Tex. Crim. App. 1998); Lemell v. State, 915 S.W.2d 486, 490
(Tex. Crim. App. 1995); 40 George E. Dix
& Robert O. Dawson, Texas Practice,
Criminal Practice and Procedure § 3.65 (Supp. 2000)); see also
McFarland v. State, 930 S.W.2d 99, 100 (Tex. Crim. App. 1996) (“An
appellate court must always address challenges to the sufficiency of the
evidence.”).