# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00546-CR

**William James Crenan, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT NO. CR24,044, HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted William James Crenan of theft from an elderly person in an amount exceeding $100,000 but less than $200,000 for stealing cattle. *See* Tex. Penal Code § 31.03. The district court assessed punishment at fifteen years' imprisonment and rendered judgment consistent with the jury's verdict.

On appeal, Crenan contends that the evidence was insufficient to support his conviction and that the court erred by: allowing Rob Beard, the owner of the cattle, to testify as an expert on the estimated number of calves that should have been born to his cows kept on Crenan's ranch; allowing Beard to testify as an expert without being disclosed as an expert; allowing Beard to testify as the State's only expert witness in violation of the Due Process Clause and Due Course of Law protections; and admitting evidence of Crenan's extraneous conduct. We will affirm the district court's judgment.

# BACKGROUND[1]

Evidence at trial showed that Crenan was the owner of C4 Cattle, Inc. and an "order buyer" for the Ty Jones Cattle Company. As an order buyer, he brokered the sale of cattle by filling orders. Generally, Crenan would find cattle from a rancher and make an offer to buy the cattle on behalf of a feedlot. Crenan would then ship the cattle from the rancher, receive the cattle at Ty Jones Cattle, write a check for the cattle to the rancher, and ship the cattle to the feedlot, which would then pay Ty Jones Cattle for the order. Ty Jones Cattle furnished Crenan with a checkbook or credit line to buy cattle, and Crenan received a commission that was figured into the sales price of the cattle.

The events leading to Crenan's theft conviction began when he entered into an oral agreement with Rob Beard, doing business as Double U Ranch, allowing Beard to graze cattle on Crenan's ranch in Milam County near the town of Rosebud. The agreement, which had no expiration date, provided that Crenan would provide all feed and care for the cattle for $15 per head each month. Beard, who lived over 600 miles away from Crenan in El Paso, made four shipments of cattle to Crenan's ranch between May 2008 and November 2009. Initially, Beard shipped 95 head of cattle to Crenan's ranch, consisting of 89 heifers and 6 bulls. Beard's second shipment was 120 heifers. Beard's third shipment was 4 bulls. Beard's fourth shipment was 150 head of cattle, consisting of 131 cows and 19 calves. By the end of November 2009, after some sales and a few deaths of cattle, Beard's herd kept on Crenan's ranch consisted of 332 cows, 19 calves, and 7 bulls. Beard's cattle were branded with a "Double U" and a 7 or an 8 for the year of their birth in 2007 or 2008. Over time, calf crops, i.e., the birth of calves, resulted in more calves for Beard's herd.

---

[1] The facts are summarized from the testimony and exhibits admitted into evidence at trial.

Although Beard asked Crenan to brand the calves born to his cattle with a "Double U," and he sent Crenan a branding iron for that purpose, according to testimony at trial Crenan never branded Beard's calves with Beard's distinguishing mark of ownership.[2] Beard noted that if one wanted to steal cattle, sell them, and get away with it, leaving cattle without a mark would ensure that their ownership would be untraceable.[3]

At trial, the jury heard from Special Texas Ranger Hal Dumas of the Texas and Southwestern Cattle Raisers Association—an organization that assists counties in combating cattle theft—who testified that even if cattle are branded, brand checks are not done for out-of-state sales, Internet sales, sales made directly between two individuals, or at packing plants or feedlots. Ranger Dumas said that there is no way to monitor those transactions for brand records, and he noted that only 20% of cattle are recovered in thefts of unbranded cattle. He agreed that someone responsible for branding or marking an animal has an opportunity to determine whether it will be identifiable: "[I]f they're going to sell them, you know, illegally, they wouldn't brand them because they know if they're in the cattle business that we're going to see that brand, especially on calves because it's going to be a fresh brand, easy to see, stand out." He also agreed that if someone stole a large group of cattle, they could be relocated to someone else's ranch where they would not be found.

Beard occasionally visited his cattle at Crenan's ranch, but initially he was not suspicious about missing cattle. Then at some point, he stopped receiving monthly invoices from

---

[2] Beard had offered to bring a crew to Crenan to do the branding, but Crenan told Beard not to worry, that he and some of his day workers would do it. Later, when Beard asked Crenan whether he had done the branding of the calves, Crenan made excuses about why he had not.

[3] Beard testified that similar to a brand, the particular way in which a rancher notches a calf's ears distinguishes one owner's cattle from another's and provides confirmation of the brand.

Crenan.  Beard continued making payments based on his estimate of the cattle on Crenan's ranch, and Crenan continued cashing Beard's checks.  In the spring of 2013, Beard became concerned about his cattle and checked on them.  He asked Crenan about problems with other parties that Crenan had been dealing with and, specifically, cattle shortages.  Crenan told Beard not to worry, that what Beard heard was a "misunderstanding."  When Beard noticed that a large number of cattle that he was paying to graze on Crenan's ranch were missing, he asked Crenan about them.  Crenan denied any shortage, stating that the cattle were "just out in the brush."  Crenan stated that he would have his ranch hand bring the feed truck so that Beard could see that the cattle were present, but after doing that, the cattle count was still short.  From that point on, Crenan did not answer Beard's calls.

Beard traveled to the Hart of Texas Feedlot in the spring of 2013 after the feedlot manager, David "Smiley" Burnett, called him to look at cattle that Crenan had shipped there.  Mixed in with the cattle that Crenan typically imported from Mexico were other calves, which Burnett placed in a separate pen.  Burnett also kept cattle on Crenan's ranch, and during a recent visit he had seen calves there.  Burnett identified 16 of the cattle that Crenan had sent to the feedlot as those that Burnett had seen at Crenan's ranch, and he suspected those cattle were part of Beard's calf crop.  At the Hart of Texas feedlot, Beard asked to see the cattle Crenan shipped.  Those calves, which had been there at least 100 days, showed characteristics of the Brahman and red Angus Beefmaster breeds that "looked exactly like [Beard's] cattle."  Crenan had not sold those cattle in Beard's name, but Beard had no doubt they were his.  Crenan disagreed.  Beard filed suit to establish ownership of the cattle, and he was paid for them after the packing house wrote a check to the feedlot.

Beard subsequently decided to remove all of his cattle from Crenan's ranch. He did not have any feed for them and hauling them back to El Paso was "not an inexpensive proposition," so he arranged to sell them at a livestock auction. In May 2013, Beard removed 410 cattle from Crenan's ranch, consisting of 220 cows, 183 calves, and 7 bulls. This left a shortage of 97 grown cattle from the original deliveries to Crenan's ranch. Ranger Dumas testified that the sale price for all Beard's grown cattle at the 2013 auction was $133,800. Beard estimated that 698 calves were missing from the expected calf crop during the time that his herd grazed on Crenan's ranch.

Ranger Dumas testified that he reviewed Beard's receipts for the cattle that he sent to be pastured on Crenan's ranch and found irregularities in Crenan's calf sales. He concluded that "it was obvious that there w[ere] a lot of calves that had not been sold . . . or should have been marketed in Mr. Beard's name that apparently weren't because he never received any funding on any calves for a period up until they cleaned the pasture out there in 2013, I think, with the exception of a handful." Ranger Dumas agreed that for a few years the calf crop was "drastically short." He testified that as part of his investigation, he reviewed brand-inspector records from 2009 to 2013, which showed that a little over 300 head of cattle—mostly calves and a handful of cows—had been sold in the name of C4, Crenan's company, while only about 77 head of cattle had been sold in the name of Double U, for Beard. The cattle sold for both C4 and for Double U were of the same description, "black or black, white-faced calves." Ranger Dumas also testified about specific cattle sales shown in two documents from the Calvert Livestock auction, located 35 miles from Crenan's ranch. Those inspection-of-cattle documents dated December 14, 2012, showed that 7 calves were

5

sold for Double U and 35 calves of "basically the same type" were sold for C4 Cattle. The checks for both of those sales were to be mailed and made payable to C4 Cattle.

The State contended below that Crenan had the motive, opportunity, and means to sell the missing cattle as his own in a single transaction, without Beard's consent, sometime shortly before May 2013. The jury heard evidence about Crenan's recent incidents of conduct involving hundreds of cattle that, like Beard's, were pastured on his ranch but later discovered "missing." The State put on evidence that Crenan had the knowledge, intent, motive, opportunity, means, and a common plan to steal Beard's cattle. At the conclusion of the trial, the jury convicted Crenan of theft from an elderly person—Beard, who was age 70 in May 2013—in the jurisdictional amount charged. The district court sentenced Crenan to fifteen years' imprisonment and ordered him to pay $575,922 in restitution. Crenan filed a motion for new trial, which the court denied. This appeal followed.

## DISCUSSION

### Issues One and Two: Sufficient evidence supported Crenan's theft conviction

Crenan's first two issues complain about the sufficiency of the evidence. Specifically, Crenan contends that the State's proof relied on the aggregation of numerous thefts, but the indictment did not allege that he committed theft pursuant to "one scheme or continuing course of conduct." *See* Tex. Penal Code § 31.09. Crenan also contends that the amount of the theft charged in the indictment was based on the expected "calf crop," which was a "speculative loss."

Conviction for the offense of theft requires proof of an unlawful appropriation of property with the intent to deprive the owner of the property. *Id.* § 31.03(a). Using the legal-sufficiency standard, we view the evidence in the light most favorable to the verdict and

6

determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, No. PD-0041-17, 2018 Tex. Crim. App. LEXIS 560, at *41–42 (Tex. Crim. App. June 27, 2018). We may not substitute our judgment for that of the jury by reevaluating the weight or credibility of the evidence, but must defer to the jury's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We apply the same standard to direct and circumstantial evidence. *Id.*

Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Nisbett*, 2018 Tex. Crim. App. LEXIS 560, at *42. Our role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally. *Id.* Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id.*; *see, e.g.*, *Glenn v. State*, 235 S.W.2d 922, 923–24 (Tex. Crim. App. 1951) (op. on reh'g) (concluding that circumstantial evidence supported jury's conviction of defendant for theft of cattle that were later found in pen at stockyard); *Heidenreich v. State*, 168 S.W.2d 254, 255 (Tex. Crim. App. 1943) (concluding that circumstantial evidence supported jury's conviction of defendant for theft of cattle that were on pasture leased by victim); *Flores v. State*, No. 10-11-00251-CR, 2013 Tex. App. LEXIS 5757, at *20, *25 (Tex. App.—Waco May 9, 2013, pet. ref'd) (mem. op., not designated for publication) (rejecting defendant's challenge to sufficiency of evidence showing that he conspired with others to engage in "cattle rustling").

Relying on *Turner v. State*, 636 S.W.2d 189 (Tex. Crim. App. 1982) (op. on reh'g), Crenan contends that the State's proof of multiple thefts was at variance with his indictment, which alleged only one theft and no aggregation theory. However, as the State notes, the offense at issue in *Turner* was a second-degree felony theft of at least $10,000 involving the defendant's submission of hundreds of Medicaid claims for medical services never rendered. *See id*. at 195. The insurer paid each claim by check, and none was for $10,000 or more. *Id*. Based on the facts of that case, the defendant could not have been prosecuted for a second-degree felony theft of at least $10,000 unless the amounts of each false claim were aggregated, and her indictment did not allege an aggregation theory. *Id*.

Here, unlike in *Turner*, the jury could have reasonably found that Crenan committed a theft of cattle from Beard in an amount exceeding $100,000 but less than $200,000 in a single incident, occurring on or about May 14, 2013, when Beard discovered that several of his cattle were missing from Crenan's ranch. *Cf. id*.; *see Williams v. State*, No. 06-01-00192-CR, 2002 Tex. App. LEXIS 8925, at *14–15 (Tex. App.—Texarkana 2002, pet. ref'd) (op., not designated for publication) (noting that State chose not to pursue continuing-course-of-conduct theory when it presented evidence that victim discovered missing items on or about date alleged in indictment and that value of those items was within jurisdictional range for felony theft); *Brown v. State*, No. 05-94-01683-CR, 1995 Tex. App. LEXIS 3938, at *5–6 (Tex. App.—Dallas May 31, 1995, no pet.) (mem. op., not designated for publication) (noting that allegation of aggregation was unnecessary where indictment charged defendant with only one occurrence of theft from one person during which multiple items were taken having total value alleged in indictment).

8

The evidence at trial supported a single-theft theory. There was testimony that when Beard visited Crenan's ranch in May 2013, he discovered that several of his cattle were missing, including 97 grown cattle, and that the average sale price for his grown cattle at auction in 2013 was $1,311.82. Thus, there was evidence that the value of the 97 missing grown cattle alone exceeded $100,000. There was also evidence that Crenan had the opportunity to make the calves born to Beard's cows unidentifiable by failing to brand them, and that Crenan had the means to move large loads of cattle, even hundreds, in a single transaction. It was further suggested at trial that Crenan had a ranch available in Falls County where he could place cattle. There was evidence that Crenan had the intent to pass off Beard's higher-quality cattle as his own, and that Crenan had the motive to commit cattle theft because of his financial difficulties. There was also evidence that Crenan had a common plan to conceal this theft, sell the cattle grazing on his ranch, and obtain the proceeds for himself. This evidence, considered in the light most favorable to the verdict, was sufficient to convict Crenan of theft and was consistent with the theft allegation in Crenan's indictment. *See Nisbett*, 2018 Tex. Crim. App. LEXIS 560, at *41–42; *Williams*, 2002 Tex. App. LEXIS 8925, at *14–15; *Brown*, 1995 Tex. App. LEXIS 3938, at *5–6.

Next, Crenan contends that the number of missing calves from the expected calf crop was speculative and insufficient to reach the $100,000 value alleged in his indictment. But as set forth in our discussion of Crenan's third issue, Beard testified without objection on the first day of his testimony about the number of calves that would have been expected in a given year, based on his lengthy experience as a rancher in the cattle business. *See, e.g.*, *Brazos River Conservation & Reclamation Dist. v. Costello*, 169 S.W.2d 977, 988–89 (Tex. Civ. App.—Eastland 1943, writ ref'd

9

w.o.m.) (rejecting challenge to admissibility of rancher's testimony as to "average size of calf crop" in determining income from property); *Cabaness v. Holland*, 47 S.W. 379, 381–82 (Tex. Civ. App.—Austin 1898, writ ref'd) (concluding that cattleman familiar with handling of stock and with knowledge of such business was qualified to express opinion estimating number of cattle that should have been on range and could refer to general rule used by cattlemen). And as we have noted, based on Ranger Dumas's testimony that the average sale price for Beard's grown cattle at auction in 2013 was $1,311.82, the value of the 97 grown cattle from the original herd that were missing exceeded the $100,000 threshold value charged in the indictment.

We conclude that the evidence at trial, viewed in the light most favorable to the verdict, was sufficient for a rational jury to find beyond a reasonable doubt that Crenan committed a single act of theft from an elderly person in an amount exceeding $100,000 as charged, and that such amount was not based on a speculative loss. We overrule Crenan's first and second issues.

**Issue Three:  No harm from admission of Beard's testimony**

In his third issue, Crenan contends that the district court erred by allowing Beard to testify as an expert for the State because Beard was not qualified as an expert under Texas Rule of Evidence 702. Specifically, Crenan complains that the court qualified Beard to testify as to the estimated number of calves that should have been born to his cows kept on Crenan's ranch.

However, Beard testified without objection on the first day of his testimony—based on his lengthy experience as a rancher in the cattle business[4]—about how many calves 337 mother

---

[4] We note that Beard testified about his relevant experience, stating that he is a 73-year old cattleman who was raised on a cattle ranch and worked on it as a youth, obtained his bachelor's

10

cows should be producing, even in a dry year. He stated that he made his projection for 2011 "smaller, because in dry years cows don't cycle . . . or have an irregular cycle. So when I did the projections, I think I lowered the conception rate or the calf crop to like 65 percent to 70 percent. Some of the younger cows, I think I projected at 70 and some of the older cows at 65. So I kind of adjusted my projection on the weather and the feed." Beard testified that his conservative estimate was that he should have been getting a 70% calf crop in a dry year like 2011, which was over 200 calves. He denied that he was getting anywhere near that in income from Crenan's sale of his calves.

Later during trial, Beard was asked about his estimates of calf crops over the years. Beard testified again that a dry year affects the cows' cycles. He acknowledged that in 2013, on the heels of a severe, several-year drought, he estimated that he had a 90% cattle crop. But during the heart of the drought, in the hard years like 2011, he projected a 60% calf crop "because of noncycling, nonbreeding." Crenan objected to that testimony, complaining that Beard lacked "any expertise" and could not "determine in a 100-year drought what the calf crop would have done."

Even if we were to conclude that admission of Beard's testimony was improper, such admission of evidence was harmless and will not cause reversal when other such evidence was received without objection, either before or after the complained-of ruling. *See Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010); *Mack v. State*, 928 S.W.2d 219, 225 (Tex. App.—Austin 1996, pet. ref'd) (no reversible error if other evidence at trial is admitted without

_____

degree in agriculture business, worked as an assistant manager at a feedlot, and was in the cattle feeding business for over a decade. He testified that he later worked for his father on the Double U Ranch, which Beard eventually bought and where he now runs "a cow-calf operation," involving the breeding and sale of calves to feedlots or feeders.

objection proving same fact or facts that allegedly inadmissible evidence sought to prove). Here, Crenan is not entitled to reversal of his conviction and there is no harm shown based on Beard's testimony about the projected calf crop during the heart of the drought because Crenan first allowed Beard to testify without objection about his estimate of the calf crop during dry years, and Crenan failed to object to Beard's trial testimony until the following day. We overrule Crenan's third issue.

**Issues Four and Five:** **Crenan failed to preserve expert-witness-disclosure and constitutional complaints**

In his fourth and fifth issues, Crenan contends for the first time that the district court erred by allowing Beard to testify as an expert without being disclosed as an expert and that the district court erred by allowing Beard to testify as the State's only expert witness in violation of the Due Process Clause and Due Course of Law protections. To preserve error for appellate review, a party must make a timely and specific objection at the earliest possible opportunity and obtain an adverse ruling from the trial court, and the complaint on appeal must correspond to the objection made at trial. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014); Tex. R. App. P. 33.1(a). Here, the record reflects that Crenan never objected to Beard testifying as an expert based on a contention that he had not been disclosed as a testifying expert before trial. Nor did Crenan present to the district court any of his constitutional complaints about the Due Process Clause and Due Course of Law protections. Thus, he failed to preserve these complaints for our review. We overrule Crenan's fourth and fifth issues.

**Issue Six:** **No abuse of discretion in admission of extraneous-conduct evidence**

In his sixth issue, relying on *Harrell v. State*, 884 S.W. 2d 154, 160 (Tex. Crim. App. 1994), Crenan contends that the district court erred by admitting evidence of his extraneous conduct without first making an initial determination that the jury could reasonably find beyond a reasonable doubt that he committed such conduct. Crenan further contends that the court was required to make that determination "at the proffer of the evidence."

However, after *Harrell*, the Texas Court of Criminal Appeals held that the timing of when the trial court must make that determination can be after the initial proffer, so long as the extraneous evidence is "connected up" with the defendant before the end of trial. *Fischer v. State*, 268 S.W.3d 552, 557–58 (Tex. Crim. App. 2008) ("*Harrell* did not decide that a trial court's ruling on an initial proffer is dispositive of the admissibility issue regardless of what evidence is presented afterwards during the trial."); *see Wolfe v. State*, No. 11-15-00004-CR, 2017 Tex. App. LEXIS 246, at \*6–7 (Tex. App.—Eastland Jan. 12, 2017, no pet.) (mem. op., not designated for publication) (noting that trial court may allow evidence of extraneous offenses even if State does not offer proof that offense occurred beyond reasonable doubt until after its proffer). The Court stated that the "purpose of the procedure described in *Harrell* was to clarify that a trial court cannot admit extraneous-offense evidence unless a jury could find beyond a reasonable doubt that the defendant committed the extraneous offense." *Fischer*, 268 S.W.3d at 558. That purpose can be achieved, as it was here, with the subsequent introduction of evidence allowing the jury to find beyond a reasonable doubt that the defendant committed the extraneous conduct. *See id.*

13

Extraneous-conduct evidence is admissible under the theft statute, once a defendant pleads not guilty to a charge of theft, to show a defendant's knowledge or intent: "[E]vidence that the actor has previously participated in recent transactions other than, but similar to, that which the prosecution is based is admissible for the purpose of showing knowledge or intent and the issues of knowledge or intent are raised by the actor's plea of not guilty." Tex. Penal Code § 31.03(c)(1). Similarly, Texas Rule of Evidence 404(b) provides that extraneous-conduct evidence, while inadmissible generally, is admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex. R. Evid. 404(b). Texas Rule of Evidence 403 provides that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury; by considerations of undue delay; or by needless presentation of cumulative evidence. Tex. R. Evid. 403. When conducting a Rule 403 analysis, the trial court must balance: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). These factors may blend together in practice. *Id*. at 642.

14

We review a trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id*.; *see United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007) (noting that trial courts are afforded "especially high level of deference" for Rule 403 determinations); *see also Keller v. State*, No. 03-13-00501-CR, 2014 Tex. App. LEXIS 12506, at *14 (Tex. App.—Austin Nov. 20, 2014, no pet.) (mem. op., not designated for publication).

Here, on the first day of trial and outside the hearing of the jury, the State disclosed what it intended to show as to each instance of Crenan's extraneous conduct. The State contended that such evidence was admissible under the theft statute in section 31.03(c) of the Texas Penal Code or under Texas Rule of Evidence 404(b), that it was relevant under Texas Rule of Evidence 401, and that the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice under Texas Rule of Evidence 403. The district court ruled on each proffered instance of extraneous conduct, and four of those were presented to the jury. During trial, the extraneous-conduct evidence was "connected up" with Crenan by testimony from law enforcement officers who investigated the incidents, testimony from the victims, and by an agreed judgment. *See Fischer*, 268 S.W.3d at 558; *cf. Higginbotham v. State*, 356 S.W.3d 584, 592 (Tex. App.—Texarkana 2011, pet. ref'd) (noting that jury was presented only one conclusory statement as proof of extraneous offense).

**1. Crenan's charge of cattle theft from Hart of Texas Cattle Feeders**

The first instance of extraneous conduct admitted into evidence was Crenan's arrest and indictment for theft of livestock from Hart of Texas Cattle Feeders. The charge resulted when hundreds of Hart of Texas's cattle were discovered missing in late 2012 from a herd of 1,600 that Crenan was expected to have on his ranch. The comptroller for Hart of Texas, Ty McMurtry, testified that Hart of Texas financed cattle on Crenan's ranch, including a transaction that involved financing 1,600 cattle at one time. McMurtry discussed transactions in which Crenan would ship loads of about 100 cattle at a time.

McMurtry testified that he first became concerned about Hart of Texas's cattle based on a report from their bank inspector. McMurtry stated that the inspector would visit two to four times a year to inspect the cattle and get head counts, which he would report back to the bank, assuring them of their security interest. McMurtry stated that after the inspector issued his report, he and Hart of Texas's manager, Smiley Burnett, attempted to verify the information reported by the bank inspector. Ultimately, McMurtry and Burnett went to the Crenan ranch and discovered a shortage of 390 cattle. Crenan told McMurtry that 271 cattle had been stolen from Crenan's pens in Presidio. McMurtry noted that even with Crenan's explanation, over 100 cattle were still unaccounted for.

Special Texas Ranger Marvin Wills testified that Crenan told a different story about Hart of Texas's cattle. When he asked Crenan about them, Crenan told him that there was no problem; all of Burnett's cattle were there. Ranger Wills visited the ranch with Crenan, and after

Crenan identified only 189 head of cattle as belonging to Hart of Texas, Ranger Wills reported Crenan's count to Burnett.

Smiley Burnett of Hart of Texas Cattle testified that he pastured 1,600 steers on Crenan's ranch. When Burnett went to the ranch to check on them, he found only 246 cattle, but Crenan told him that the rest were in an east pasture that was muddy and inaccessible because of recent rain. Crenan later told Burnett that approximately 260 cattle had been stolen from his pens in Presidio. That news caused Burnett to visit Crenan's ranch again, this time including the previously inaccessible pasture, where Burnett again found only 246 cattle.

### 2. Crenan's charge of cattle theft from Andy Rogers

The second instance of extraneous conduct admitted into evidence was Crenan's 2013 charge of theft and misapplication from Andy Rogers. This theft involved over 200 steers that Crenan had agreed to pasture at his ranch but were later discovered "missing." Rogers testified that he runs the Rogers and Sons Feedlot, and that he had agreed to pay Crenan to buy some steers for him, feed the steers on Crenan's ranch until they weighed 600 pounds, and then send them to Rogers's feed yard. Rogers testified that Crenan bought steers for him and put them on Crenan's ranch in different loads, including one load of 192 cattle. After Crenan "trucked them up here," he "suppos[ed]ly turned them out on his grass." But when Rogers went to check on his cattle at Crenan's ranch in April 2013, he saw that there were none. Rogers notified Milam County Sheriff David Greene, who advised Rogers to send a certified letter to Crenan requesting return of his cattle or his money. After the letter was returned unclaimed, Rogers testified that he told Sheriff Greene that he wanted to press charges. Within three days, the sheriff informed Rogers that Crenan had

17

given him two certified checks for Rogers's cattle: one in the amount of $81,758.52 and the other in the amount of $82,000. Copies of both checks were admitted into evidence.

Rogers testified that after Crenan repaid him the money for the cattle, he was no longer interested in pressing charges against Crenan. On cross-examination, Rogers was asked whether he was aware that his steers were on a ranch in Falls County belonging to Diane Dolan. Rogers testified that he had never heard of Dolan and that no one told him his cattle were at her ranch. On re-direct, he testified that he did not think it was plausible that his cattle were just somewhere else, but if he had been so notified, he would have verified that the cattle were there.

Ranger Wills and local law enforcement also testified about the theft from Rogers. Ranger Wills stated that after he received Rogers's report, he drove to Crenan's ranch in March 2013 and was unable to observe any cattle with Rogers's brand. He testified that he made this trip within 2½ months of inspecting Crenan's ranch for Burnett's cattle. Milam County Chief Deputy Chris White testified that Crenan was arrested and charged with theft of property, less than $200,000 but more than $100,000, and misapplication of funds. He stated that after news of the offense spread through the cattle industry, Beard heard about it and requested an investigation because he also had cattle on Crenan's ranch. Deputy White testified that in July 2013, a few months after the Rogers case was resolved, he obtained warrants for the theft of livestock from Beard. Sheriff Greene testified that he was aware of other thefts in Milam County involving Crenan when Rogers was negotiating restitution for the cattle, and that he advised Rogers, "if he could get his money, he needed to get it because I didn't know where this was going to end up."

18

### 3. Crenan's charge of cattle theft from Don Lewis

The third instance of extraneous conduct admitted into evidence was a 2013 theft from cattle buyer Don Lewis. This theft involved Crenan taking 20 steers to the Hart of Texas feedlot and selling them in his own name. Ranger Wills testified that he investigated this offense and that he was able to verify that Crenan stole cattle from Lewis.

### 4. Crenan's $340,000 unpaid agreed judgment on loan to buy cattle

The fourth instance of extraneous conduct admitted into evidence was Crenan's 2007 unpaid agreed judgment in favor of Charlie Boyd for Crenan's loan to buy cattle. John Robert Hodge, who met Crenan when Crenan's family was a customer of Ty Jones Cattle, testified about Crenan's conduct. Hodge stated that Crenan needed more credit than he could get from the local bank, and that he borrowed money from Boyd, an elderly man who was Hodge's friend. Boyd's loan was made so that Crenan could buy calves, raise them on his ranch, and sell them. Hodge testified that this was a short-term loan, just for that set of cattle, and that Boyd expected payment with interest when the cattle were sold.

Later, Boyd was unable to get Crenan to return his phone call, and he became concerned about the cattle he had financed. Boyd, who was too old to drive, asked Hodge to confirm whether the cattle were still on Crenan's ranch. When Hodge saw that the number of cattle was short, Crenan told him that the cattle were "off in the brush." But Hodge noticed that a pond of water near that brushy area, from which the cattle were supposedly drinking, was overgrown with tall weeds indicating that no cattle had been drinking there. Hodge concluded that the cattle Boyd financed for Crenan were not there. After the visit to Crenan's ranch, Hodge referred Boyd to an

attorney. An agreed judgment of $343,109.50 was entered against Crenan, and a certified copy of the judgment was admitted into evidence below. Hodge testified that neither Boyd nor Boyd's estate ever obtained any money in accordance with the judgment for the missing cattle.

The district court did not abuse its discretion by ruling that these four instances of conduct were admissible under the theft statute or under Rule 404(b), and that the evidence was relevant. The cattle thefts from Hart of Texas and Rogers were recent incidents of conduct that were similar to the underlying prosecution and indicated Crenan's knowledge or intent to commit cattle theft from Beard. *See* Tex. Penal Code § 31.03(c)(1). They involved hundreds of cattle that were pastured on Crenan's ranch but later discovered "missing." The cattle theft from Rogers resulted in Crenan's arrest, but he was not prosecuted because Rogers lost interest in pressing charges after Crenan paid him $163,758.52 for the cattle. Additionally, evidence of Crenan's recent theft from Lewis of steers that Crenan later sold to a feedlot in his own name showed Crenan's intent to pass off cattle belonging to others as his own to obtain financial gain. *See id.*

All of these cattle-theft incidents—including Crenan's $343,109.50 unpaid agreed judgment to an elderly man from whom Crenan borrowed money to buy and raise cattle that were never found on Crenan's ranch—offered proof of Crenan's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See* Tex. R. Evid. 404(b). Further, although a limiting instruction was included in the charge, the defense did not inform the jury that it could consider the extraneous-conduct evidence only if it found beyond a reasonable doubt that Crenan committed the wrongful conduct. The extraneous-conduct evidence showed that Crenan had financial difficulties, providing him with a motive to steal Beard's cattle. While the prosecution

20

need not prove motive, evidence of motive is a significant circumstance indicating guilt. *Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd); *see Nisbett*, 2018 Tex. Crim. App. LEXIS 560, at \*50 ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt."); *see also Bennett v. Reynolds*, 315 S.W.3d 867, 868 n.3 (Tex. 2010) (noting that livestock crimes rose during economic downturn and that Legislature stiffened criminal penalties for stealing cattle). Ranger Wills testified that he investigated multiple cases of cattle that went missing from Crenan, that Crenan "was in a bind," and that Crenan had been through bankruptcy. Ranger Wills agreed that Crenan's debts to Hart of Texas, Rogers, and Lewis, along with Boyd's judgment against Crenan, offered some indication of Crenan's motive to steal from Beard.

The incidents involving the Hart of Texas Feedlot and Rogers in particular showed that Crenan had the means to relocate large loads of cattle, even hundreds, in a single transaction as alleged in Beard's indictment. Defense counsel also suggested that Crenan had someone else's ranch available in another county where he could place cattle. The extraneous-conduct incidents showed that Crenan had the intent to pass off cattle belonging to others as his own cattle so that he could sell them and keep the proceeds for himself. The incidents also showed a common plan to commit theft from cattlemen who placed their cattle on Crenan's ranch and to conceal such theft by denying that any cattle were missing and telling those who visited the ranch that their cattle were in brushy or muddy locations where the cattle were hardly visible or inaccessible. Further, these incidents showed the absence of mistake or accident, linking Crenan's pattern of cattle theft to his conduct in

21

this case and making the chances of a mere bookkeeping error as to the number of Beard's cattle much less probable.

**District court's ruling**

The district court did not abuse its discretion by determining that the probative value of the extraneous-conduct evidence was not substantially outweighed by a danger of unfair prejudice. *See* Tex. R. Evid. 403. The court could have reasonably determined that the State had a considerable need for such evidence, given the circumstantial nature of the case and Crenan's demonstrated ability to avoid prosecution by entering into an agreed judgment that he never paid and denying to cattlemen and law enforcement that the cattle were missing. The court could have reasonably determined that the tendency of the evidence to suggest decision on an improper basis, to confuse or distract the jury from the main issues, or to be given undue weight by the jury was minimal. The court's charge instructed the jury that it should consider the extraneous-conduct evidence only if it found beyond a reasonable doubt that Crenan "did in fact commit the wrongful act" and then, only for the purpose of showing his knowledge or intent. We presume the jury followed those instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). The evidence about the extraneous conduct was not overly technical or confusing and did not involve topics that the jury was not equipped to consider. *See Keller*, 2014 Tex. App. LEXIS 12506, at *17. And the court could have reasonably determined that the time needed to link Crenan to the extraneous conduct, which required review of the facts and the parties' relationships, did not consume an inordinate amount of time or merely repeat evidence already admitted. *See id*. We conclude that the court did not abuse its discretion by admitting the extraneous-conduct evidence based on its implicit determination that the jury could

22

have found beyond a reasonable doubt that Crenan committed the extraneous conduct. We overrule

Crenan's sixth issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Goodwin

Affirmed

Filed:   August 15, 2018

Do Not Publish